Bernard S. Meyer, J.
The infant whose custody is .sought by this writ was born November 22,1957. The relator, the mother, was then 20 years of age. She was then and is still unmarried. *443 She was cared for at Angel Guardian Home, and while there arrangements were made, through her stepmother, to board the child with respondents. Respondents were not previously known to relator or her stepmother.
Six days after birth of the infant, relator and her father and stepmother delivered the infant to respondents under an arrangement whereby relator was to pay respondents $20 per week covering the care of and food for the infant and to pay all further expenses of the infant. Relator testified that the father of the infant promised to contribute $2 a week to the support of the child, and that he made a few weekly contributions but thereafter did not live up to his promise. For four weeks after birth of the infant, relator was unemployed, after which she had part-time employment as a salesgirl until sometime in January, 1958, when she went back to the place of employment she had left during the latter part of her pregnancy. She is still employed there and makes between $42 and $50 per week.
From the time the infant was delivered to respondents until February 15, 1958, relator visited the infant at respondents’ home, the exact number of visits being in dispute. The $20 weekly payment was made at first by relator’s stepmother, although relator claims she reimbursed her stepmother, and later by relator. On February 15, relator was in arrears at least one week and a medical bill was due. On that day relator and a girl she had met at the Angel Guardian Home visited respondents’ home. It is undisputed that at this time relator asked respondent wife whether she would like to adopt the child, that the wife answered that she would be thrilled to, that her son was adopted and she had been seeking a girl to adopt, but that she had to be sure because she was then 39 years of age and would not be permitted to adopt a child after 40. Relator responded that she was sure. Relator says she suggested the adoption because her expenses for the baby were running between $30 and $35 a week and she could not meet those expenses. Respondents say relator indicated she felt they would give the infant a good home and that adoption would be for the best interests of everyone. It was agreed that relator would receive a picture of tire child each year. Arrangements were made at that time for relator to visit respondents’ attorney.
A few days later, respondent husband picked relator up in his car and took her to the attorney’s office. The attorney discussed procedures with her, took the necessary information from her, told her to give the matter serious thought and then come back to see him. On February 26, after first calling to make an appointment, relator went by herself to the attorney’s *444 office and signed an agreement of adoption which had been completed on the printed form of the Nassau County Surrogate’s Court and a typewritten affidavit reciting the facts essentially as set forth above and acknowledging that she had executed the agreement voluntarily and without any compensation. The attorney testified that she did not appear at the time to be under any emotional stress. The adoption proceeding was begun by the filing of respondents’ petition on April 3, 1958, but has never been completed. The Surrogate’s Court record (which with consent of respondents’ attorney the court has reviewed) includes a letter dated September 18, 1958, from the Legal Aid Society counsel advising that relator had requested the society to represent her in opposing the adoption and with a view toward relator’s obtaining custody of the child. There is nothing in that record to show that a citation ever issued to relator or that the Surrogate’s Court has obtained jurisdiction of her except as her signature of the agreement may be held to give that court jurisdiction over her.
Just when relator informed respondents that she had changed her mind is in dispute. Relator fixes the time as late April or early May and says she believes it to have been April 27 which was the Sunday after her twenty-first birthday. The girl she had met at the Angel Guardian Home, who accompanied her to respondents ’ home on the day in question, fixes the date also as April 27. Respondents, on the other hand, fix the time as July 22 and the testimony of both respondents was that the day was a Sunday. Both say that a female cousin of respondent husband was at their home on July 22, though respondent husband says she did not arrive until relator had left. The cousin testified that she had been called to respondents’ home on July 22 by respondent wife, who was hysterical, that relator was not present, and that she was sure of the date because she could fix it by an anniversary mass said the day before. Reference to the calendar, however, shows that July 22, 1958 was a Tuesday not a Sunday. As hereafter appears, the court does not find the exact date material, but were it material, would find that the demand and refusal were in early May rather than July.
Relator testified that she went to the police in May, but that they told her they could not help her, that she had no funds for an attorney and that she was finally sent to the Legal Aid Society in New York City in August and by that office referred to the Legal Aid Society of Nassau County. The letter of September 18,1958 referred to above, and, ultimately, this proceeding followed. Relator says she called respondents in June or *445 July and in December in further efforts to obtain return of the child. Respondents admit calls in both July and December but contend that on each occasion a demand was made for money.
Relator has arranged, if she obtains custody of the infant, to move with the infant into the home of a Mrs. A. B. who will care for the infant ’ during the day. Though not related to relator, Mrs. A. B. testified that she was willing to feed and care for the infant and permit relator to live with her, all without charge, if necessary, the exact financial arrangement being left to be worked out as relator’s situation permits.
On the record so far detailed, relator would clearly be entitled to custody of the infant, for whatever the law may have been prior to People ex rel. Kropp v. Shepsky (305 N. Y. 465) (cf., e.g., Matter of Anonymous, 198 Misc. 185) the Shepsky case made-clear (1) that between parent and nonparent “ the primacy of parental rights may not be ignored * * * even
if the nonparent initially acquired custody of the child with the parent’s consent ” (p. 469); (2) up to the time that a nonparent obtains legal and permanent custody through adoption, guardianship or otherwise, the burden is on the nonparent to show that the parent abandoned the child or is unfit and that the well-being of the child requires its separation from the parent; (3) that the burden on the nonparent is the same, despite the parent’s initial consent, if consent is thereafter withdrawn; and (4) the material advantages to the child in remaining with the nonparent cannot be considered in determining whether the parent shall have custody. (See, also, People ex rel. Portnoy v. Strasser, 303 N. Y. 539; cf. Matter of Bistany, 239 N. Y. 19.)
Implicit in the language of the ShepsTcy case is the conclusion that until the nonparent has legally obtained parental status, the parent may withdraw consent previously given. Clearly, the six-month period provided by subdivision 7 of section 112 of the Domestic Relations Law is not a Statute of Limitations on the right to withdraw consent, for the subdivision simply prevents the making of a final order of adoption until the child has resided with the foster parent “ for at least six months ”. (Emphasis suppEed.) It foEows that whatever right the parent has to withdraw consent continues until a final order of adoption or guardianship is made (People ex rel. Anonymous v. Anonymous, 195 Misc. 1054) and, therefore, that it does not matter whether relator’s demand for return of the child was made in AprE, May or July.
Nor does the fact that relator has not been granted permission in the Surrogate’s Court proceeding to withdraw the consent *446 she gave in the. agreement of adoption and in the affidavit referred to above prevent this court from awarding her custody if it determines that her revocation of consent should be given effect. The fact that in the Shepshy case there had been a revocation proceeding in the County Court prior to the Supreme Court habeas corpus proceeding is not authority to the contrary, since in that case there had been a final order of adoption under which the foster parents legally detained the infant. Since only the Supreme Court can award custody (People ex rel. Kropp v. Shepsky, supra), relator may invoke the broad equity powers of the Supreme Court to determine in one proceeding and as part of the question whether she is entitled to custody of the child, whether her attempted revocation of consent will be given effect. The writ may not be defeated by the technical argument which respondents’ attorney advances that the filing with the Surrogate’s Court of relator’s consent gives that consent the status of a mandate of the Surrogate’s Court pursuant to which respondents legally hold the infant, notwithstanding relator’s later revocation of the consent. (See People ex rel. Anonymous v. Anonymous, supra.)
What limitation is there on the right of a natural parent to revoke consent? In a case which turned on the admissibility of a recording in which the parent demanded money as the condition for not withdrawing her consent, the Appellate Division, Second Department, held (Matter of Anonymous, 286 App. Div. 161, motion for leave to appeal denied 286 App. Div. 968), that the recording was admissible, that a parent may not revoke consent merely because of a change of mind, and that a demand for money as a condition for not withdrawing consent would require disallowance of the attempted revocation. In so holding, the court stated (pp. 165-166): “It is our opinion, therefore, that although the mother may have no right to condition her consent on a subsequent change of mind, the Surrogate may, in the exercise of his discretion, and on consideration of all the circumstances, relieve her of her agreement and permit the consent to be withdrawn for reasons which would not be legally sufficient to justify the cancellation of a contract involving other rights or different relationships. It would be neither practicable nor desirable to attempt to formulate any all-inclusive statement which could govern the exercise of this discretion in all cases. Each case must depend and must be decided on its own facts. It is sufficient to say that neither the provisions of the Domestic Relations Law, nor the decided cases, require the conclusion that the mother has a *447 right to revoke her consent, which may be arbitrarily exercised, or that judicial officers, charged with responsibility in adoption proceedings, may be required to permit a revocation if it is prompted by a purpose which is illegal or contrary to accepted concepts of sound morals. The question being one of judicial discretion should be decided on all the facts including, but not limited to, the circumstances under which the child was surrendered and the consent was given, and the motive for the attempted repudiation. * * * Whatever may be the limits of the Surrogate’s discretion, we entertain no doubt as to how it should be exercised, if it shall be found that the facts are as they are claimed to be by appellants. If the continuance of respondent’s consent was conditioned on the payment of money and her attempted revocation was prompted by appellants’ refusal to accede to her demand for payment, the exercise of a sound discretion will require the denial of her application.”
The conclusions that must be drawn from the holdings in the Shepsky case and in Matter of Anonymous are (1) that revocation of consent will be given effect and the child returned to its parents unless the facts indicate either abandonment by the parent, unfitness of the parent, or an improper motive for the attempted repudiation, and (2) that the burden of proof on each of those points is on the respondent nonparent in a proceeding, such as this, in which the parent, having repudiated the consent, seeks custody.
Respondents herein have not met their burden. They attempted to show that relator’s motive was improper because she had demanded money, that relator was unfit because the infant is admittedly her second illegitimate child and because relator was maintaining an abnormal relationship with the girl she met at the Angel Guardian Home, that relator had abandoned the infant, and that relator was trifling with the court and its processes since on cross-examination she stated that before she signed the consent on February 26, 1958, she knew that she did not want to go through with the adoption. Each of these contentions will be separately considered.
The testimony concerning relator’s demand for money as a condition for not withdrawing her consent came solely from the respondent wife. She testified that relator telephoned a few days before she came to respondents’ home to demand return of her child and during that telephone conversation stated that she had changed her mind and wanted the baby back, but that she would not block the adoption if it were ‘1 made worth her while. ’ ’ Respondent wife further testified that relator called *448 again in December and asked what the baby needed, at which time respondent asked whether relator still intended to block the adoption and relator is said to have replied, “Yes, unless you do what I asked.” Relator flatly and categorically denies any such demand for money. Respondents’ attorney testified that he received a call from relator in July, advising that she wished return of the baby, but he does not indicate that anything was said by relator with respect to payment of money. Although respondents agreed that a few days after the telephone conversation referred to above, relator, accompanied by the girl she had met at the Angel Guardian Home, appeared at respondents’ home and demanded that the baby be turned over to her, that relator was kept standing on the porch of respondents’ house and not permitted to enter, and that a heated exchange occurred between the parties, there is no testimony of any demand for money at that time, nor is there any indication that either respondents or relator ever brought up the subject. No effort was made by respondents (as it was by the foster parents in Matter, of Anonymous, supra), to obtain a recording of relator’s asserted demand, nor was any report made of the demand to any police authority. No effort has been made by respondents to press the adoption proceeding to a conclusion although clearly if they proved that relator had improperly demanded money, the Surrogate, under the holding in Matter of Anonymous, would, in the exercise of a sound discretion, have been required to deny relator the right to revoke her consent. While, of course, it would be contrary to public policy to permit a natural mother to exact money or other reward as a condition for withholding revocation of her consent, the mere assertion by respondents that such a demand was made is not sufficient to meet the burden of proof rule stated in the Shepsky case. The court finds that respondents have failed to prove that relator made a demand for money.
Respondents’ contention that relator is unfit is grounded in part on a stipulation that on October 31, 1954, at the age of 17, relator gave birth to another illegitimate child. That child has been adopted and relator, therefore, is not burdened with its support. Respondents’ contention apparently is that the having of more than one illegitimate child indicates such promiscuity as to warrant the court in holding the relator unfit to rear her second child, for except as hereafter indicated, respondents have come forward with no other evidence showing relator to be presently leading an immoral or promiscuous life. Recognition, as is given in the Shepsky ease, to the principle that the *449 natural mother has a paramount right against a nonparent to the custody of her child requires that, if the child is to be taken from its natural parent, something more be shown than the inference of promiscuity that may be drawn from the repetition of such an “indiscretion.” As the Shepshy case indicates, what the court is required to do is to assess relator’s present fitness for the duties of motherhood and in so doing it 1 ‘ may not weigh too heavily indiscretions of long ago.”
Respondents sought to prove relator an unfit person because of an asserted abnormal relationship with the girl she met at the Angel Guardian Home. To bear out this contention, they elicited testimony from the two girls showing that they maintained an apartment together from March, 1958 to February, 1959 and that for the four weeks preceding the hearing on this writ, they had both been living in relator’s grandmother’s home, that in the apartment there was only one bed and that in the grandmother’s home they slept in the same bed (which the grandmother characterized as “ a big bed”), and finally that respondent wife’s brother, sent to serve subpoenas on the two girls, found them in a small, dimly lit, first-floor room, sitting on a couch. There is no suggestion in his testimony that the girls were surprised in any unnatural position or that they were not fully clothed nor has there been anything at all presented which would indicate that the situation was other than as the girls suggest: they were watching television and, therefore, only one lamp in the room was lit. The testimony thus adduced shows opportunity, but is devoid of even the slightest indication of inclination. Indeed the contrary might be inferred from the fact that what brought the girls to the Angel Guardian Home, where for the first time they met, must necessarily have been relationships with men. While they could be bisexual, the court finds that there is a complete failure of proof on the point.
With respect to the claim that relator has abandoned her child, respondents are met with the fact that since May (or if respondents’ version be accepted, July) of 1958, relator has actively sought the return of the child, physically presented herself at respondents’ home to demand the return of the child, consulted the police, consulted the Legal Aid Society, and ultimately caused this proceeding to be brought, all in her effort to obtain return of the child. While the time period covered by these events is measured in months rather than weeks, no particular inference arises from that fact when it is remembered that relator is young, has had financial problems, and so far as appears has had no other encounter with legal procedures *450 than in this matter and in connection with the adoption of her first child. If she is to be charged with abandonment of the child, it must therefore be by reason of her initial consent to the adoption and the time lapse between that consent and its attempted revocation. Clearly the initial placement of the child with the respondents was not an act of abandonment but rather was an attempt by relator to find a means of carrying out her duties as a mother. So far as the record shows, relator’s later suggestion of and consent to the adoption was motivated by her financial situation. Even in giving her consent, and indicating that she felt it best for the child that she know only respondents as parents, relator was not willing completely to sever all ties, for it was agreed that she receive an annual photograph. While, apparently, Mrs. A. B. was willing at that time to take relator and her baby into her home, the fact that relator’s judgment then was that the better course would be to permit adoption by respondents cannot be given such final and irrevocable effect as to prevent relator from withdrawing her consent or be considered an irrevocable abandonment by relator of her child. As so aptly put by Judge Cardozo in Matter of Bistany (supra, p. 24) a court in a case such as this can find abandonment only when it is: “ prepared to hold that by acts so unequivocal as to bear one interpretation and one only the parents manifested •an intention to abandon the child forever. They may have weakly hesitated. They may have foolishly delayed. They may have drifted into a situation in which their desires and expectations were open to misconception. They may even have experimented a little, to test their own feelings. All that is not enough. They must be found to have renounced. ’ ’ Even though relator’s contacts with respondents after she demanded return of her child were few, she did not relent in her efforts to obtain the return of the child. While, as respondents urge, a demand for money may constitute an abandonment (see Matter of Anonymous, supra; People ex rel. Hydock v. Greenberg, 273 App. Div. 710), they are not aided by this legal rule because, as hereinabove stated, they have failed to prove that relator made such a demand. The evidence in this case does not show that ‘ ‘ settled purpose to be rid of all parental obligations ’ ’ that “callous disregard for the child” which the Court of Appeals in Matter of Maxwell (4 N Y 2d 429, 433) held to constitute abandonment, permitting the court to dispense with the parent’s consent. It, therefore, does not indicate that relator intended to renounce her child, nor justify the court in refusing to give effect to her withdrawal of consent.
*451 The final point made by respondents is predicated on a statement by relator during her examination as respondents ’ witness that she knew prior to her signing of the consent papers on February 26, 1958 that she wanted to keep the child. This testimony took the form of an affirmative reply to a question put by respondents’ counsel in the course of an examination sufficiently rigorous that just prior thereto relator became emotionally upset, burst into tears and had to leave the witness box to regain her composure. Even disregarding the setting in which the testimony was given, the court cannot find this to be a valid reason for withholding return of the child to its mother. While, of course, no person may be permitted to trifle with the processes of the courts, the mere fact that when relator signed the Surrogate’s Court papers on February 26 she did not make know her change of heart, is not sufficient to make her consent irrevocable. As the court in Matter of Anonymous (supra) makes clear, we are not concerned with the enforcement of contract doctrines. Respondent wife testified that when relator first called to demand the return of the child, relator concluded by stating that it had taken a great deal of courage for her to call, but that having called, she intended to follow up by coming out to get the child. That relator did not on February 26 have the courage necessary to reverse herself, and hesitated for several months thereafter before acquiring that courage, cannot be a bar to revocation. It is just this kind of situation for which the waiting period required by subdivision 7 of section 112 of the Domestic Relations Law was established.
In reaching the conclusions set forth herewith, the court is neither unmindful of, nor unsympathetic toward, the position of the respondents. However, having waited as they did until a few months prior to respondent wife’s fortieth birthday, they had already taken whatever risk there is, under the various agency rules, in her being over age. They would have been in the same position with respect to any child they sought to adopt. While undoubtedly they sought to impress upon relator the problem they might be presented with if she changed her mind, the fact that relator ultimately did, despite her assurances, change her mind, is of no assistance to respondents. There is no estoppel or waiver that can make irrevocable the consent of a natural mother who has not abandoned, is not unfit, and does not seek to revoke her consent for an improper motive.
Since the court finds that respondents have not in any respect met the burden imposed upon them under the rule of the Shepsky case, custody of the child must be awarded to the natural *452 mother. Relator’s plan to live with and have the child cared for by Mrs. A. B. appears feasible, but with the consent of both, the order to be entered hereon will provide for supervision by the Probation Department. The writ is therefore sustained and respondents are directed to deliver the child to the custody of relator at the offices of relator’s attorney. Unless the parties can agree upon the date and hour for such delivery, they will be fixed by the court in the order to be entered on this decision.
All motions on which decision was reserved at the hearing are disposed of accordingly. The court further orders that the papers in this proceeding be filed in the County Clerk’s office and sealed and that they be subject to the inspection of no person other than the parties hereto or their duly authorized attorneys, except upon, order entered herein on notice to all parties concerned.
Submit order.