Louis B. Heller, J.
In this habeas corpus proceeding the petitioner husband, who is separated from his wife, respondent herein, seeks a determination as to custody of the infant son of the parties, who has been in the care and charge of respondent since January, 1960. The child, who became five years of age in February of this year, is the sole issue of the parties.
Petitioner seeks custody on the ground that the respondent is unfit, by reason of mental disability to properly rear the child.
At the outset, I wish to commend the attorneys in this proceeding for their able and helpful presentation of the facts and *1091 of their respective arguments. They have been fair, diligent and conscientious in the performance of their labors in this ease, and equally noteworthy has been their splendid co-operation with the court’s efforts to arrive at a result that would, in the unfortunate circumstances of this case, be in the best interests of the child. The deep concern for the proper determination of an issue which involves so vitally the future welfare of the child was shared by counsel in this case.
The necessity of making a determination as to custody of children of tender years always involves difficult soul searching on the part of the court charged with such responsibility when, as here, the facts and circumstances disclose no such conduct on the part of either of the contesting parents toward their offspring as would merit censure. While the court does not remain unaffected by feelings of sympathy, in cases of this nature, for both parents whose devotion to their child is unquestioned, nevertheless the factor which must govern the determination of the issue of custody in such proceeding is the welfare of the child. This is the paramount and controlling consideration (Finlay v. Finlay, 240 N. Y. 429; Matter of Bachman v. Mejias, 1 N Y 2d 575, 581; People ex rel. Pritchett v. Pritchett, 1 A D 2d 1009, affd. 2 N Y 2d 947; People ex rel. Glasier v. Glasier, 2 A D 2d 289, 290). The court acts “ as parens patriae to do what is best for the interest of the child ” (Finlay v. Finlay, supra, p. 433; see People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 468). It is the duty of the court to award custody to the parent who, under all the circumstances, can more adequately serve the child’s best interests (People ex rel. Fields v. Kaufmann, 9 A D 2d 375, 376) and best protect and preserve the health, welfare, education and well-being of the infant (People ex rel. Fields v. Kaufmann, supra, p. 377). It logically follows that the fitness of a particular parent as custodian of the child becomes a proper subject of judicial inquiry only as the question affects the welfare of the child.
No hard and fast rule can be prescribed as to what is in the best interests of the child. Each case must be considered within the framework of its own facts and circumstances.
The question of which of the two contesting parents can best provide for the welfare of the child is a matter for the sound discretion of the court (Bunim v. Bunim, 298 N. Y. 391, 393). Such discretion is to be esercised on the basis of findings supported by the weight of the evidence (see Matter of Bachman v. Mejias, supra, p. 581 and eases there cited).
With these considerations in mind, I approach the question of custody to be determined in this case. The parties were *1092 married in 1953 and, as I have indicated, the child was born in 1957. The facts which have been stipulated in this proceeding are in substance as follows: Prior to June, 1958 the respondent was under psychiatric care. She was admitted to Kings County Hospital in June, 1958 where the diagnosis, on her discharge some nine days later, was “ schizophrenic reaction, acute, undifferentiated type, incipient. ’ ’ The day following discharge from Kings County Hospital, namely, June 26, 1958, respondent was admitted to St. Vincent’s Hospital where the diagnosis upon discharge three months later (September 25, 1958) read as follows: “Schizophrenic reaction undifferentiated type.” Bespondent was then admitted to Hillside Hospital on September 25, 1958 where she remained until December 23, 1959, with her condition being diagnosed upon discharge as “ schizophrenia, paranoid type.” Her condition on discharge from that hospital was noted as “ improved ” with the type of discharge being “ to community.” In addition to the foregoing facts as stipulated, the record also established that after respondent’s discharge from Hillside Hospital, the child here involved was delivered into her care by the petitioner who, by his version as set forth in the petition, “ agreed to permit” respondent to have the child “ on a trial basis to determine if she was physically and mentally capable of rearing the child.” It also appears that the surrender of the child into the care and custody of the mother was made at least partly on the basis of a letter from a Dr. Benjamin, a supervising psychiatrist at Hillside Hospital, which stated that respondent was then capable of taking care of the physical and emotional needs of her son.
It is petitioner’s contention, as stated in his petition, that respondent’s condition has failed to improve and has apparently worsened, and that she has not rid herself of the obsessions and. compulsions which accompanied the mental illness for which she was hospitalized. It would serve no purpose to detail the alleged acts of neglect toward the child and the obsessions and compulsions which, according to petitioner, have characterized his wife’s behavior since January, 1960 during the time that she has had the child under her charge. It may be noted in this connection that the petitioner does not suggest that his wife has in any way behaved violently or has so acted toward the child as to place him in immediate danger of physical harm.
Upon a reading of all the papers in this case and upon the testimony, both lay and medical, adduced at the hearing held before me, I reach the view that petitioner has failed to establish satisfactorily that there is a credible basis for the petitioner’s claim of continued abnormal behavior on the part of *1093 respondent that is of such a nature as to interfere with the proper rearing of the child during his tender years or to cause a reasonable apprehension of harm, either physical or mental, to the child. Indeed, the vastly preponderant weight of the testimony and of the other evidence in the case strongly supports the conclusion that the respondent has, since January, 1960, provided for the welfare of the child in a sufficiently fitting and proper manner. All of the lay witnesses but one have testified to the affectionate care, devotion and sense of responsibility with which the respondent has been rearing the child. The great weight of the medical testimony adduced at the hearing is that the respondent is in a state of remission and is capable of providing proper care for the child and, further, that it would be in the child’s best interests for him to remain in the care and custody of the mother. These are the findings and conclusions reached by two of the psychiatrists called to the stand on behalf of the respondent, experts who indisputedly are highly qualified and competent by reason of their training and experience in the field of psychiatry to testify as to the question of respondent’s fitness vis-a-vis her child. Their observance of respondent and their respective examinations noted an absence in the respondent of any signs of abnormal behavior or, specifically, obsessions and compulsions which petitioner claims continued to characterize respondent’s behavior after her discharge from Hillside Hospital.
Dr. Hulse, a child psychiatrist, was the third expert produced by respondent. He examined the child and talked with the mother. He testified that the child was absolutely normal and that he could see no abnormalities in the child’s mother during his interview with her and his observations of her. He was similarly of the view expressed by the other two experts who testified on behalf of respondent, that it would not be in the best interests of the child to separate him from his mother. Indeed, these experts unanimously were of the opinion that it would be harmful to the child to separate him from his mother at this time. In the words of Dr. Helfand, one of the psychiatric experts, “You take away a child from a mother invariably it causes psychic trauma.”
The only other medical testimony was that given by the psychiatrist who, pursuant to stipulation, was appointed by the court to examine the respondent and the child as an aid in determining this application. This psychiatrist read the hospital records concerning respondent and had interviewed her at his office for a period of 50 minutes on each of two occasions. It was his opinion that respondent was not in a state of remission. *1094 Moreover, aside from an apparently not clearly defined impression that respondent was not reacting in a sufficiently “ emotional ’ ’ manner under all the circumstances, his observations of her present behavior as revealed in the afore-mentioned interviews in no wise contradicted the views, expressed by the three other psychiatrists, that she appeared normal with no sign of any suspiciously abnormal behavior. This psychiatrist’s view that the child would inevitably be permanently harmed emotionally if permitted to remain in the care of respondent was evidently predicated upon the assumption that the respondent continued to be afflicted by the obsessions, compulsions, etc., which concededly accompanied her mental disability prior to her discharge from the hospital. This view, as is hereinabove noted, finds little or no support in the witness’ personal observations of the respondent.
It is inescapably clear from the testimony of this witness that his opinions as to respondent’s present condition represent findings and conclusions drawn almost exclusively from the history and diagnosis revealed in the hospital records pertaining to respondent’s condition prior to January, 1960 and are in no substantially significant aspect based upon his observation and examination of respondent on the two occasions on which he interviewed her. Excerpts from his testimony, hereinbelow quoted, bear out this conclusion. Thus, he testified as follows on questioning by the court:
Q. Did you ask her [the respondent] about her present relationship with her son? A. Yes.
Q. What did she tell you about that? A. That she took very good care of her son; that she fed him properly, that she dressed him properly; that she saw to it that the things that a kid requires are taken care of.
Q. Did you believe her when she said that? A. I have my reservations.
Q. What were your reservations based on? A. They were based upon my having read the records about the seriousness of her illness and the kind of an illness that she suffered from. It was based upon the fact that 1 felt that this sort of an illness cannot really be cured * * *
Q. Just a minute, doctor. How did you finally determine the type of illness that she now has? A. Well, that was based upon the records.
Q. What was your determination? A. Diagnosis was based upon extremely extensive and detailed records.
Q. I know, but what was your diagnosis? A. The same as that of Hillside Hospital.
And at a later point, in response to the court’s questioning, he testified as follows:
Q. Suppose the mother has testified that in the past year or year and a half she has come to a full realization that these obsessions which she conceded she had, and compulsions, are being eliminated by her? A. I would have to oppose to that.
*1095 Q. Would your answer be the same? A. Yes.
Q. Why? A. I simply would not accept the statement.
Q. You wouldn’t accept her statement? A. That’s right.
Q. Why not? A. Simply based upon the general knowledge of the seriousness of this disease, that it is not likely, and especially since, after all, we know what her motivation is — she’s a mother — she does not want to give up the custody of the child — then she is very likely to present, you know, a better aspect of the situation than actually exists.
Q. Would you say her conduct toward a child under such circumstances is feigned? A. Largely.
The witness repeatedly conceded that he did not question respondent about the particular obsessions and compulsive acts which were charged to her. Nevertheless, when he was pressed on cross-examination with regard to his failure to discuss these symptoms with her, he answered that he did not ask her ‘ ‘ because the only question that was involved, it seemed to me then, and now, is whether or not it is still here, you see; nobody questions that it was there, but whether it was still here, and I didn’t see any reason for creating a traumatic interview”. And at another point, when it was brought out by respondent’s counsel on cross-examination that the witness failed to question the petitioner about her allegedly irrational acts, the witness answered, by way of a “ blanket statement ” that “ I had my information — I knew what the intent of the interview was. I didn’t see any reason to disturb the woman unnecessarily. I have no reason on earth to doubt the records from a reputable hospital, and this would be the answer to all of these things.” Yet, when he was questioned on cross-examination with respect to a statement contained in his written report to the court, that treatment of respondent had resulted in a good deal of improvement, and he was asked whether that statement was based on his own observations or based on information obtained from the records, he answered as follows: “ My own observations, the way she behaved in the office, her own statements about herself, and a conversation with Dr. Jacob.”
Finally it should be mentioned that this witness, while stating in effect that it was not possible to make a definitive observation regarding the question of whether the child was in fact being detrimentally affected while under the care of the mother, conceded that he found no indication that the child was developing other than normally, unaffected by any of the anxieties and abnormal acts which had been attributed to respondent by petitioner.
The opinions expressed by three of the four psychiatrists who testified in this proceeding as to the fitness of the mother herein to care for her child and to provide for the child’s needs *1096 have been reinforced by the results of ray own observations of, and conversations with, respondent and her child. Respondent’s speech, actions and general demeanor appeared normal in every respect, and she created a favorable impression upon the court. She showed full cognizance of the abnormal character of her past thoughts and behavior and she talked about the shattering incidents of her life in a manner that convinced the court that she has conquered her depressions, phobias and compulsions. She demonstrated to the satisfaction of the court that she now has full control of her mental faculties.
Equally significant was the appearance and behavior of the child. With the concurrence of the attorneys I interviewed the child in chambers. In line with the thought that actions often speak louder than words and bearing in mind petitioner’s contention that the child would be influenced by the mother’s alleged obsessive fear of touching doorknobs, I walked out of my chambers with the child, permitting him to precede me. He showed no reluctance or hesitation in placing his hand on the doorknob of the door leading out of my chambers. While it was too heavy for him to open, nevertheless I noticed that he instinctively went for the knob and I came to the conclusion that this phase of the respondent’s obsessions had no effect upon the infant’s conduct. During the time that the infant was before me I noticed that his face was radiant and exuberant, his voice was clear and vibrant, and he laughed spontaneously and heartily. He gave every appearance of being bright, happy and well adjusted, and in good health physically, mentally and emotionally. He appeared to be well cared for. There was not the slightest suggestion or intimation in his words, actions and expressions that he had in fact adopted, or was in danger of adopting, through imitative behavior, any of the fears, anxieties, obsessions or compulsions with which the respondent allegedly was afflicted. It should be emphasized that the foregoing observations were made at a time when the child had been in the sole care and charge of the mother for a continuous period of almost 20 months.
The findings of the court-appointed psychiatrist, insofar as they are based upon personal observation and examination of the respondent and her child, do not, in the main, diverge from the findings of the other experts. His disagreement with the conclusions reached by these other experts with respect to the respondent’s ability to properly take care of her child may be said to rest upon an assumption that can be fairly stated as follows: that once a parent has been afflicted with a condition diagnosed as schizophrenia, paranoid type, she can never safely *1097 be entrusted, in the future, with the care and custody of her child despite any subsequent recovery or improvement in her condition, however substantial. Such a premise is one which not only runs counter to the informed views expressed by the other experts in this case but is one which in my opinion the courts will not subscribe to, as a matter of law. None of the cases cited by petitioner in which custody was denied to a mother can be said to rest on any such foundation. Those cited cases, as respondent’s reply brief has indicated, are distinguishable. Thus, in Matter of Reinhart v. Reinhart (33 Misc 2d 80), where petitioner, with a history of schizophrenia, paranoid type, was denied custody of her six-year-old son, an adopted child, the following significant facts appear from the opinion in that case which distinguish the case in certain material respects from the instant case. In the cited ease the child had remained in the care and custody of the father during the entire period following the mother’s discharge from the hospital, where she was described as “ improved hence, there was no objective demonstration of the mother’s ability, following her discharge from the hospital, to properly rear the child and, specifically, to meet satisfactorily the challenges posed by the stresses and strains attendant upon the care of a child. Moreover, in that case the court placed great emphasis on the fact that a separation agreement, later embodied in a divorce decree, was entered into between the parties, in which the wife agreed that the husband was to have custody of the child. The court found that the wife had willingly and deliberately entered into such agreement. While it is true that any agreement between parties regarding custody of their offspring cannot bind the hands of the court, which is charged with providing for the welfare of the child, it must also be borne in mind that a willingness to surrender custody or to allow custody in another in circumstances such as were found to exist in the Reinhart case may well have been deemed by the court in that case to manifest either an awareness on the part of the mother of her inability to take proper care of the child or an absence of that degree of affection which should characterize the love of a mother for her infant child.
The cases from other jurisdictions which were cited by the instant petitioner in support of his position are also distinguishable in the respects noted in respondent’s reply brief.
Turning to the other side of the coin, it may be observed that the courts have not been disinclined to award custody to a mother where her mental condition has shown sufficient improvement (see Matter of Anonymous, N. Y. L. J., Jan. 9, *1098 1959, p. 13, col. 3 [Supreme Ct., Queens County, Pette, J.] and cases collected in Ann. 74 A. L. R. 2d 1080 et seq.).
A case in point is Commonwealth ex rel. Beishline v. Beishline (176 Pa. Superior 231 [1954]). That case involved a petition brought by a father against his estranged wife for custody of their two youngest children, aged 7 and 4, who were living with their mother. The evidence showed that the mother’s illness had been diagnosed as dementia praecox, paranoid type; that she had been committed to a State mental hospital from which she was released some five months later, “ on furlough,” because she appeared to be in a state of remission; that a hospital psychiatrist who had treated her testified in the case that it was “ very difficult to ever state that a patient recovers from this type of mental illness,” (p. 234) but that the mother appeared to be making a good adjustment, although her basic condition remained. This psychiatrist testified further (p. 234) that while “ a violent aggressiveness ” is not uncommon in the paranoid type of dementia praecox, he found no evidence of planned violence on the part of the mother, as a result of delusions of persecution. There was other medical testimony in that case that the mother’s mental disorder was exceedingly mild and that she was making an excellent recovery and, further, that “the prognosis of a prolonged remission is exceedingly good.” (p. 234). The lower court awarded custody to the mother. On appeal, the appellate court sustained this ruling and stated that ‘ ‘ [n] otwithstanding the serious type of respondent’s mental disorder there is support for the validity of the conclusion of the lower court ” (p. 235).
In the instant proceeding, while I have given due consideration to the views expressed by the psychiatrist appointed to assist the court in arriving at a proper determination in the case, it must be emphasized that no halo is to be placed around the independent expert as such. His testimony is not to be accepted or given any particular weight merely by reason of his identification as an independently selected specialist. Even though his professional standing and independence are recognized, it does not follow that his opinions may not be tested, qualified or even discredited. His conclusions must be weighed and evaluated in the same balance as are those of the experts produced by one of the parties.
Bearing in mind that our courts have recognized the propriety of committing a child of tender years to its mother, in the absence of other overriding considerations (see Ullman v. Ullman, 151 App. Div. 419, 424-425; People ex rel. Pritchett v. Pritchett, 1 A D 2d 1009,1010, supra), and upon the entire record *1099 in this case, I conclude that it is to the best interests and welfare of the child to award custody to respondent at this time. Respondent is accordingly awarded full custody upon the following conditions: that she shall submit to psychiatric examination semiannually and that she shall make available to petitioner copies of the psychiatric report of said examinations.
As a precautionary measure in order to insure the continued welfare of the child, the court directs that the parties seek and accept the aid of a recognized social welfare agency to guide and assist the respondent mother in the solution of any problems which may arise in the future concerning the welfare and upbringing of the infant. The fees, if any, are to be paid by the petitioner. In the event that the parties are unable to agree on any particular agency, the court will, if so advised by either party, make such selection. The determination awarding custody to respondent is, of course, without prejudice to further application by petitioner for custody of the child upon proof of the existence of such conditions in the future as indicate that the child’s welfare is being detrimentally affected as a result of being in the care and custody of the respondent. The order to be entered hereon shall provide for such ample visitation rights to petitioner as the parties may agree upon, or in the event of disagreement, the court will determine and fix such visitation rights.