■ In the Matter of Infant D. (Anonymous).— In a proceeding by the unwed natural mother of a child to revoke her consent to adoption of the child

by respondents and to regain custody of the child, the natural mother appeals from an order of the Family Court, Westchester County, dated January 18, 1972, which, after a hearing, *inter alia* denied her application. Order affirmed, without costs. Contrary to the facts obtaining in *Matter of Anonymous* (41 A D 2d 961), wherein we are reversing an order denying a natural mother's motion to revoke her consent, the Family Court Judge in this case has made a finding of unfitness with respect to the natural mother. He determined that she could not properly assume and finance the care, training and education of her child and that her own relationships were not sufficiently stable to warrant the return of the child. We believe this finding to be fully supported by the evidence. Although petitioner, the natural mother, stated she would work while her own mother cared for the child, petitioner's mother was then working, too; and petitioner was either totally ignorant or deliberately evasive about her parents' financial circumstances. In addition, petitioner herself, before her pregnancy, had left the home to which she now requests the court to return the child and did not return until just before the hearing. She claimed that her parents had not known of her pregnancy and that, out of fear of their reaction, she did not tell them of the child's existence until some six months after its birth, when she received a letter from a probation officer informing her that an adoption petition had been filed. However, whether or not her parents, in fact, knew of the child's existence, it would appear, at the very least, that petitioner herself did not feel assured of their support during the most trying times. Finally, while petitioner claimed she would be married in June, 1972, that she would then take care of the child herself and that her fiance, a student and not the natural father of the infant, would stand by her, it appears that she did not get married at that time. Her fiance, incidentally, accompanied her to the attorney's office when she made the preliminary adoption arrangements. Munder, Acting P. J., Latham and Christ, JJ., concur; Benjamin, J., dissents and votes to reverse the order and grant the application, with the following memorandum, in which Gulotta, J., concurs: In the absence of abandonment, surrender or unfitness, the mother's consent to an adoption of her child is essential (Domestic Relations Law, § 111; *Matter of Spence-Chapin Adoption Serv.* v. *Polk*, 29 N Y 2d 196). This record reflects no evidence of a valid consent, unfitness, or abandonment. Accordingly, the adoption may not proceed and the child should be returned to the custody of her natural mother. In order to find abandonment the evidence must show a settled purpose to be rid of all parental obligations and to forego all parental rights. The burden of proving abandonment rests on those who allege it (*Matter of Maxwell*, 4 N Y 2d 429; *Matter of Bistany*, 239 N. Y. 19). A finding of abandonment against a parent may be made only after the parent has been given the benefit of every controverted fact (*Matter of Cocozza* v. *Antidormi*, 35 A D 2d 810). The proof in this record falls far short of the required standards. Petitioner is the natural mother of an out-of-wedlock child. Petitioner was born on August 26, 1951 and became pregnant in January, 1970, when she was a student at Miami Dade Junior College. The father of the child has abandoned petitioner. On August 5, 1970, when petitioner was seven months pregnant, she was referred to one Walter B. Lebowitz, a Miami attorney, by a friend. She consulted him about her predicament and, admittedly, she signed some *preliminary* papers with respect to the adoption of the as-yet-unborn child. Unbeknownst to petitioner, Lebowitz had already been retained by respondents to locate an adoptive child. Nevertheless, Lebowitz presumed to act as petitioner's attorney and he made arrangements for her care. On September 4, 1970 the child was born, in a hospital. One day later, in the hos-

pital, Lebowitz induced petitioner to sign a paper consenting to the adoption. Petitioner did not read the paper; nor was its meaning and effect explained to her. She understood the paper to be another preliminary form and, indeed, it at one point refers to foster — not adoptive — parents. Amongst other things, the paper (postdated September 17, 1970) states that petitioner was 21 years old when, in fact, she was but 19; that Lebowitz was petitioner's attorney when, in fact, he was Florida counsel for the prospective adoptive parents; that petitioner had known Lebowitz for one year professionally and socially, when petitioner had actually met him for the first time on August 5, 1970; that Lebowitz knew the prospective adoptive parents, when he did not; and that petitioner had received no compensation, when in fact Lebowitz had paid her $200. On September 7, 1970 petitioner was discharged from the hospital. She released the baby to Lebowitz who, without undo delay, spirited the baby away to New York. On September 9, 1970 petitioner called Lebowitz's office because she wanted her baby back. Lebowitz was out of town and did not return petitioner's call. Shortly thereafter, Lebowitz found it necessary to forge petitioner's signature on the forms (bearing the date September 17, 1970) required by our courts for an adoption to proceed (see 22 NYCRR 20.12; Domestic Relations Law, § 115, subd. 7). This is extremely persuasive proof that petitioner's consent was not yet deemed final but only preliminary and revocable. Why else would it be necessary to forge petitioner's signature? Prior to Christmas of 1970 petitioner contacted Lebowitz to obtain copies of her medical bills, which she wanted to repay. Between then and New Year's Day petitioner called Lebowitz and told him she wanted her baby back. Lebowitz told her that her consent had already become final and that there was no way the Judge would permit her to get her baby back. This representation was, of course, false. It appears that respondents' adoption petition was filed in the Family Court on November 2, 1970. Subdivision 1 of section 116 of the Domestic Relations Law provides that "When the adoptive child is less than eighteen years of age, no order of adoption shall be made until six months after the court shall have received the petition to adopt". Even if an order of adoption has been made, it may be vacated for fraud, newly discovered evidence or other sufficient reason (Domestic Relations Law, § 114). The very purpose of the six-month waiting period is to give both the natural parent or parents and the prospective adoptive parents sufficient time to reflect and consider their actions (*Matter of Anonymous*, 60 Misc 2d 854, 858). It is intended to benefit both parties (*Matter of Bruce*, 269 App. Div. 718, affd. 295 N. Y. 702). Here, the very purpose of our statute was frustrated by Lebowitz's despicable and self-interested misrepresentation. Thus, petitioner's inaction between New Year's Day and March, 1971 must be laid at the door of Lebowitz and cannot be held to have impaired petitioner's rights. At worst, her delay represents excusable indecision (*People ex rel. Anonymous* v. *Louise Wise Serv.*, 21 A D 2d 327; *Matter of Bistany*, 239 N. Y. 19, 24, *supra*). In March, 1971 petitioner received a letter from a probation officer of the Family Court. The letter advised petitioner that the officer wished to know if there had been any change with respect to petitioner's consent to the adoption. Without any doubt, the consent referred to by the probation officer included the papers forged by Lebowitz or at his direction.* Petitioner promptly retained Florida counsel and on March 15, 1971 he advised the court that petitioner wanted to revoke her consent and to have the child returned to her. On May 12, 1971 an order directing that petitioner be given notice of

---

* There is absolutely nothing in the record to indicate that the prospective adoptive parents had any knowledge of Lebowitz's wrongdoing.

the adoption proceeding was made. On May 19, her counsel advised the court a second time that the consent had been revoked. On June 22, 1971 petitioner executed a formal revocation at the insistance of the court. Thereafter, the hearing in Family Court took place. It is beyond cavil that petitioner did not abandon her child. There was no settled purpose on her part to be rid of all parental obligations and to forego all parental rights (*Matter of Maxwell,* 4 N Y 2d 429, *supra*). Rather, the only settled purpose dramatically indicated by this record is Lebowitz's nefarious design to deprive petitioner of her maternal rights at almost any cost, including forgery and fraud (see *People ex rel. Kropp* v. *Shepsky,* 305 N. Y. 465). It likewise appears that any consent purportedly executed by petitioner was in fact timely revoked (*People ex rel. Kropp* v. *Shepsky, supra*; *People ex rel. Louisa* v. *Faella,* 37 A D 2d 598). The only remaining ground for affirmance is the finding of unfitness, which finding, as already noted, would render petitioner's consent unnecessary. There is nothing in this record to indicate that petitioner is a parent "who is a drunkard, an incompetent, a notoriously immoral person, cruel or unkind towards * * * [her] child" (*Matter of Gustow,* 220 N. Y. 373, 377). She has not neglected her child; rather, she relied on Lebowitz's representation — which appears to be true — that the prospective adoptive parents had an excellent reputation in the community and were persons of sufficient financial means to give the child proper care. Accordingly, there is no significance in petitioner's failure to send the child money (*Matter of Bistany,* 239 N. Y. 19, 23, *supra*). It is absurd to consider petitioner unfit because she failed to send her child, then three months old, a Christmas greeting card. Petitioner testified that Lebowitz would not give her the child's address or send such a card for her. Nor does petitioner herself lack adequate means to care for and educate the child. Petitioner — who has almost two years of college and who has worked in the past, even while pregnant — testified she would work and that her mother would care for the child while she was working. Petitioner plans to be married shortly and her fiance (not the father of the child) has said he would stand by her. In *People ex rel. Kropp* v. *Shepsky* (305 N. Y. 465, 469, *supra*) Judge Fuld (now Chief Judge) noted: "In no case may a contest between parent and nonparent resolve itself into 'a simple factual issue as to which [affords] the better surroundings, or as to which party is better equipped to raise the child.' (*People ex rel. Portnoy* v. *Strasser, supra,* 303 N. Y. 539, 542). And that is true even if the nonparent initially acquired custody of the child with the parent's consent." There has been no change in this rule (*Matter of Spence-Chapin Adoption Serv.* v. *Polk,* 29 N Y 2d 196, 203–204, *supra*). Indeed, as this court has noted in a case decided herewith: " There exists in the law a presumption that the best interests of a child whose adoption is sought are served by returning the child to the natural parent or parents (*People ex rel. Scarpetta* v. *Spence-Chapin Adoption Serv.,* 28 N Y 2d 185; *People ex rel. Kropp* v. *Shepsky,* 305 N. Y. 465; *People ex rel. Portnoy* v. *Strasser,* 303 N. Y. 539). Such presumption cannot be overcome except for the gravest reasons (*Matter of Spence-Chapin Adoption Serv.* v. *Polk,* 29 N Y 2d 196; *People ex rel. Scarpetta* v. *Spence-Chapin Adoption Serv., supra*; *People ex rel. Kropp* v. *Shepsky, supra*; *People ex rel. Portnoy* v. *Strasser, supra*). Furthermore, 'the burden rests, not * * * upon the mother to show that the child's welfare would be advanced by being returned to her, but rather upon the nonparents to prove that the mother is unfit to have her child and that the latter's well-being requires its separation from its mother' (*People ex rel. Kropp* v *Shepsky,* 305 N. Y. 465, 469, *supra*) " (*Matter of Anonymous,* 41 A D 2d 961). In *Matter of Anonymous* (*supra*)

the Surrogate made no finding of unfitness with respect to the natural mother. For this reason this court was required to and did permit that natural mother to revoke her consent to the adoption. The same result must follow here because the Family Court's finding of unfitness is unsupportable (*People ex rel. Louisa* v. *Faella*, 37 A D 2d 598, *supra*). Two further points remain. Last year the Legislature made important changes in the law of adoption (L. 1972, ch. 639). Thus, section 1 of chapter 639 added a new subdivision 5 to section 383 of the Social Services Law. This amendment, in effect, purports to eliminate the presumption in favor of the natural parent — notwithstanding that such parent is "fit" to have custody of the child — in determining the best interest of the child. This amendment became effective on May 30, 1972 (L. 1972, ch. 639, § 4; McKinney's Cons. Laws of N. Y., Book 1, Statutes, § 41) and has only prospective application (§ 51). Section 3 of the same chapter 639 (adding section 115-b to the Domestic Relations Law) makes consents to private-placement adoptions irrevocable under certain circumstances. This amendment became effective August 28, 1972 and does not apply to consents executed prior to that date (L. 1972, ch. 639, § 4). Even if this amendment were applicable, petitioner's consent does not comply with the strict requirements set forth therein. To hold that petitioner may not recover custody of her child would permit separation of almost any child from its unwed mother upon a test of comparative fitness and material advantages. This is an impermissible test; as Chief Judge Fuld so well stated in *People ex rel. Kropp* v. *Shepsky* (305 N. Y. 465, *supra*). The best interests of this child dictate that she be returned to her mother.