STATE OF NEW YORK ex rel. PATRICIA A. WALLACE, Respondent, v GEORGE LHOTAN et al., Appellants, and JOSEPH D'ELIA, as Commissioner of the Department of Social Services of the County of Nassau, Respondent.

Second Department, February 23, 1976

*Marcia Robinson Lowry* and *Peter Bienstock (Robert Kruger* on the brief), for appellants.

*John C. Schaeffer, Jr., (Seth P. Stein* of counsel), for Patricia A. Wallace, respondent.

*John F. O'Shaughnessy, County Attorney (Natale C. Tedone* and *James N. Gallagher* of counsel), for Joseph D'Elia, respondent.

*Per Curiam.* On September 4, 1970, the petitioner voluntarily placed her six children in foster care. At the time she was unable to care for them and had severe emotional problems consistent with *post partum* depression. The Department of Social Services (the Department) accepted the children and placed them in three homes: the two oldest, Cheryl and Patricia, were placed with the appellants George and Dorothy Lhotan; the younger girls, Cathleen and Cynthia, were placed with a Mr. and Mrs. Dunne; and the boys, John and William were placed with a third family. The children were never surrendered for adoption and were never intended by the

petitioner to be abandoned or permanently alienated. In September, 1972 the Department arranged for Cathleen and Cynthia to be placed with the Lhotans; since then, the four girls have been together under the foster care of the Lhotans.

In December, 1972 the petitioner's condition improved and the boys were returned to her after the Department determined that she was able to care for them. Follow-up visits by Department personnel have shown that the boys are doing very well with the petitioner; no one now questions that she has been a loving and fit mother for the three years that have elapsed since then. Mrs. Clingan, a social worker, testified that she has visited the petitioner's home about a half a dozen times, that she found the boys "are extremely well adjusted, happy and outgoing youngsters, and that there is a natural affection between the boys and Mrs. Wallace," that the boys are healthy and well fed and that the home is clean.

The Department's records note that, before Cathleen's and Cynthia's removal from the Dunnes to the Lhotans, they had a "fair relationship" with their mother. After the transfer, the attitude of these two children towards their mother materially deteriorated to a point where they now say that they do not want to see her.

On August 10, 1973 Mrs. Clingan took the children for a supervised visit to the petitioner; it was a difficult encounter. The children acted as though their mother was not there; they did not talk to her, but spent the entire time with their brothers. The Department sensed the growing alienation of the children; its November 29, 1973 summary of the girls' relationship with the Lhotans reads as follows: "Cathleen and Cynthia have a very close, clinging relationship with Mrs. Lhotan. Mrs. Lhotan seems to be overly protective of the children and does nothing to allay the fears the children have regarding their mother. All the girls cling to her whenever they feel the least bit threatened and although Mrs. Lhotan has been asked to try to help them build up a working relationship with their mother, her saccharine, condemning manner destroys any effort she may try to make."

Numerous visits to the Lhotan home persuaded the social worker that Mrs. Lhotan was not co-operating with the Department to help the children overcome their negative feelings about their mother. The trial record amply supports this view and the Trial Justice so found.

A further memorandum in the file of the Department, made

on June 5, 1974, noted that Mrs. Lhotan is unable to work with the petitioner, that she does not co-operate with the agency, that the girls are being psychologically harmed, that the social worker's efforts to encourage Mrs. Lhotan to better the children's relations with their mother have caused a shift from subtle to overt hostility on the part of Mrs. Lhotan and that the children now refuse to speak to the social worker. The social worker concluded that consciously or unconsciously, Mrs. Lhotan has frustrated all efforts to improve the relationship between the children and their mother.

It should be noted that prior evaluations of Mrs. Lhotan by the Department praised her for the warmth and security she was giving the children and stated that she had been concerned about the infrequency of visitation by the petitioner. Nevertheless, her responsibilities were larger than this. She had a duty not to interpose herself between the children and their natural mother. It was the alleged failure to respond to this duty that has finally brought this case to court.

On May 22, 1974 the Department referred the matter for a psychiatric evaluation. On June 17, 1974 an "interdisciplinary conference" was held, attended by professional people of broad experience who had studied the problems of these children. The professionals included (1) Dr. Allen Reichman, a psychiatrist (who had previously interviewed the petitioner and Cynthia, on the basis of which he determined that the petitioner was able to care for the children and that Cynthia "sort of rattled * * * off [her complaints about her mother] as if they had been rehearsed"; it was his opinion that she was relating something that had been told to her); (2) Dr. Irving Solomon, a diplomate in clinical psychology and a certified psychiatrist (who had previously examined Cathleen, whose grievances [he said] sounded rehearsed; it was his opinion that she felt that to accept her mother would be a violation of loyalty to the Lhotans); (3) Roslyn Kantor, a psychiatric social worker; and (4) Estelle Rapoport, a staff psychologist (who had examined Cathleen by Rorschach and thematic apperception tests and found that she appeared to be controlled by others).

On June 17, 1974 the conclusions and recommendations of the interdisciplinary conference were set forth as follows:

"Among the disciplines it was agreed that the Lhotan home (foster placement) is not emotionally suited for the Wallace Children in that it is rigid and controlling and prejudicial against the natural mother. The children are responding to

this environment by becoming constricted and defiant. Complicating matters, we have a natural mother who is not that emotionally stable. Nonetheless, she has demonstrated some growth and an increasing desire to have the children. Her treatment of the two youngest boys indicates her capacity to mother appropriately. Therefore, we recommend the following:

"1. Cheryl and Patricia be placed in a new foster home with the goal of ultimate placement with their natural mother. This is done to reduce the present pressure on the natural mother.

"2. Return, as soon as possible, Cindy and Cathy to their mother.

"3. Supportive psychotherapy for Mrs. Wallace close to her home. Consideration of chemotherapy should be suggested to the therapist.

"4. Homemaker services are vital to strengthen the mother's ability to cope with predictably negatavistic children.

"5. If the above plans do not work out we suggest a reconsultation of this difficult situation."

On or about June 26, 1974, and pursuant to 18 NYCRR 450.10, the Department advised the Lhotans of its intention to remove the girls from their foster care and to ultimately return them to their mother. The Lhotans were advised that they had the right to request a conference; they did apply therefor, but did not appear. Prior to the scheduled conference date, they obtained a restraining order against any proceeding seeking removal of the children (this was as part of a class action in the Federal courts contesting the constitutionality of the State procedures for removal of children from foster homes). This caused quite some delay. Meanwhile, the petitioner instituted this habeas corpus proceeding; Special Term refused to stay this proceeding (pending outcome of the Federal action) and the appeal from Special Term's order was dismissed by this court on May 5, 1975 *(State of New York ex rel. Wallace v Lhotan,* 48 AD2d 665).

The habeas corpus trial consumed eight days; it was a thoroughgoing and bitterly fought trial. The evidence ranged far and wide and included testimony of the petitioner's behavior prior to and after the voluntary placement of the children, the extent of her visitation, the observations of social workers (to a large extent as embodied in the Department's records) as

to the interpersonal relationships of the persons involved and of psychiatrists as to the possible traumatic effect of removal of the girls from the Lhotan home. Also, there was an in-chambers questioning by the trial court of the four girls, in the presence of all counsel, wherein the girls were encouraged to discuss their memories of what life was like before the placement, their relationship with their mother thereafter, and their present feelings as to whom they want to live with and why.

The trial court concluded that the children's aversion to returning to their mother was in large part due to the controlling influence of the Lhotans, but that their main concern (in addition to the love they naturally have for the Lhotans) was in not being separated. The trial court also noted that the Lhotans have not sought to adopt, and determined that the best interests of the girls would be served by their return to their mother. It was ordered that the younger girls be returned to the petitioner within 10 days, that the older girls be returned to the petitioner within 30 days, and that the children remain under the supervision of the Department for one year, during which time the Department might make such application to the court as it may deem in the best interests of the children. Further, the petitioner was directed to adhere to the directives of the Department, including acceptance of supportive psychotherapy during the period of readjustment, and the Department was directed to furnish homemaker services until such time as it decides that they are not needed.

Thereafter, by application of the Lhotans, a further trial was ordered for the submission of "new evidence". A seven-day trial ensued; the new evidence related mainly to the homekeeping and conduct of the petitioner prior to and after the 1970 placement. The trial court concluded that the "isolated instances which occurred several years ago" did not detract from its conclusion that the petitioner is presently capable of being a fit mother. The testimony at the new trial of the original foster parents of the boys (who have maintained a continued relationship with the petitioner) reinforced the conclusion that had been reached by the Department as to the boys' healthy relationship with their mother. As stated by the trial court, "the boys appear to have made a complete and successful transition back with their mother, and have readily involved themselves in the normal boy's activities". The trial

court adhered to its original determination sustaining the writ of habeas corpus. The amended judgment, entered after the new trial, provided that the Lhotans return the girls to the Department, that the younger girls then be returned to the petitioner forthwith, and that the older girls "be placed by the Department of Social Services in a temporary foster home as the Department of Social Services determine possesses the necessary expertise and guidance and dedication to serve as a bridgehead towards the successful return of the girls to their mother, provided, however, that such placement shall not exceed six months, unless further ordered by the Court". Surrender of the children has been stayed, by order of this court, pending the determination herein.

The Commissioner of the Department of Social Services, named as a respondent in this proceeding, has submitted a brief to this court urging affirmance of the amended judgment, judgment and order.

The appellants allege, *inter alia,* that the trial court erred in its finding that the petitioner is presently a fit mother. Based on many personal observations since November, 1972, the Department concluded that she was. The petitioner was extensively examined at the trial and the trial court concluded that she had the capability of handling the difficulties of the situation, with the aid of social service facilities and supportive psychotherapy, if needed.

As stated in *Matter of Irene O.* (38 NY2d 776, 777); "In a matter which turns * * * particularly on the assessment of the character and temperament of the parent, the findings of the nisi prius court must be accorded the greatest respect. The situation would be different, perhaps, if there were critical issues of fact as to what occurred; but in this matter the assessment is not of probabilities or meanings of events. On the contrary, in cases of this kind, the assessment is of persons, character, and their capacity to fulfill responsibilities and not only to intend what they say but to fulfill what they intend."

We are satisfied that the evidence does not show abandonment by the petitioner and that gaps in visitation, including a hiatus from October, 1972 to July, 1973, were due to circumstances beyond her control, or were otherwise excusable. We believe that this case illustrates the wisdom of *Matter of Spence-Chapin Adoption Serv. v Polk* (29 NY2d 196, 205),

wherein the court said: "To the ordinary fears in placing a child in foster care should not be added the concern that the better the foster care custodians the greater the risk that they will assert, out of love and affection grown too deep, an inchoate right to adopt. The temporary parent substitute must keep his proper distance at all costs to himself" (cf. Social Services Law, § 383, subds 3, 5; § 384, subds 3, 4, 5; Domestic Relations Law, § 115-b).

This caveat applies a fortiori where the foster care custodians do not seek to adopt. In any case, the foster parents must make a serious attempt to encourage, not discourage, the improvement of relations between the children under their charge and a mother who is trying to re-establish the bonds of family love and concern. A portion of the love that foster parents have for the children must be directed towards easing their return to their natural parent. Whatever circumstances will rend the family fabric, it should not be the result of actions of the foster parents, who have taken on their delicate responsibilities on the solemn promise to do otherwise.

As stated by this court in *Matter of Bennett v Jeffreys* (51 AD2d 544): "In a contest between a parent and a nonparent for the custody of an infant, the parent enjoys the paramount right to raise the child, and will not be deprived of that right, absent a showing of unfitness or abandonment *(Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196; *People ex rel. Kropp v Shepsky,* 305 NY 465) or some other supervening reason why the parent should be deprived of custody."

Here, there was no unfitness and no abandonment. Nor do the strongly expressed aversions of the children constitute a "supervening" reason in view of the trial court's conclusion (with which we agree) that they are explained by the controlling influence of the Lhotans and the children's fear of being reared apart. True, they (or at least the older girls) have realistically bitter memories, but their mother was not given the chance to show that, though she was once ill, she has now recovered. The Lhotans, though well-meaning, did not give the petitioner that chance because of their love for the girls. The evidence indicates that, given that opportunity, the petitioner will do as well with the girls as she has with the boys. In the best interests of these girls, they should be with their mother and brothers (cf. *Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196, 204, *supra).*

RABIN, Acting P.J., LATHAM, MARGETT and CHRIST, JJ., concur; HOPKINS, J., concurs in the result.

Amended judgment, judgment and order of the Supreme Court, Nassau County, entered November 6, 1975, July 9, 1975 and October 28, 1975, respectively, affirmed insofar as appealed from, without costs or disbursements.