**ORGANIZATION OF FOSTER FAMI-
LIES FOR EQUALITY AND
REFORM et al., Plaintiffs,**

v.

**James DUMPSON, Individually and as Administrator of the New York City Human Resources Administration, et al.,
Defendants,**

**Naomi Rodriguez et al.,
Intervenors-Defendants.**

**No. 74 Civ. 2010.**

United States District Court,
S. D. New York.

March 22, 1976.

As Amended March 29, 1976.

Stay Granted May 24, 1976.

See 96 S.Ct. 2197, 2198.

Probable Jurisdiction Noted Oct. 12, 1976.
See 97 S.Ct. 232.

Marcia Robinson Lowry and Peter Bienstock, New York Civil Liberties Union, New York City, for plaintiffs Organization of Foster Families for Equality and Reform, Madeline Smith, Ralph and Christiane Goldberg, George and Dorothy Lhotan, on behalf of themselves and all others similarly situated.

Helen L. Buttenwieser, New York City, for plaintiffs Danielle and Eric Gandy, Rafael Serrano, Cheryl, Patricia, Cynthia and Cathleen Wallace, on behalf of themselves and all others similarly situated.

Adrian Burke, Corp. Counsel by Elliot P. Hoffman, Asst. Corp. Counsel, New York City, for defendants James Dumpson and Elizabeth Beine.

John F. O'Shaughnessy, County Atty. of Nassau County by James N. Gallagher, Mineola, N. Y., for defendant James P. O'Neill.

Louis J. Lefkowitz, Atty. Gen. of the State of New York and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City by Stanley L. Kantor, New York City, for defendants Bernard Shapiro and Abe Lavine.

Marttie L. Thompson and Toby Golick, New York City by Louise Gruner Gans, New York City, for intervenors-defendants.

Before LUMBARD, Circuit Judge, and POLLACK and CARTER, District Judges.

## OPINION

LUMBARD, Circuit Judge:

The Organization of Foster Families for Equality and Reform (OFFER) and three individual foster families bring this class action for injunctive and declaratory relief seeking the invalidation of New York Social Services Law §§ 383(2) and 400, and N.Y.C. R.R. § 450.14. Plaintiffs allege in their complaint that the above provisions violate both the Equal Protection and Due Process Clauses of the Fourteenth Amendment in that they authorize the state to remove foster children from their foster homes without affording a prior hearing to either foster child or foster parents.[1]

Plaintiff foster parents initially sought to represent, as "next friend," the interests of their foster children as well. However, to forestall any possible conflict of interest, Judge Carter appointed Helen Buttenwieser as independent counsel for the foster children, advising the parties of his action by letter dated October 29, 1974. In that capacity, she has consistently argued that the foster parents have no constitutionally cognizable interest independent of those of the foster children and that an adversary hearing is not the proper forum to determine the "best interest of the child."[2] The defendants—government officials at the state and local level and the Executive Director of the Catholic Guardian Society— are responsible for administering the foster care system within their respective jurisdictions. In addition, five biological mothers of children currently in foster care were granted leave to intervene in these proceedings on behalf of themselves and all others similarly situated.[3]

The present statutory scheme, applicable throughout most of the state,[4] provides that the local public welfare department or an authorized private agency acting on its behalf[5] may, in its discretion and on 10 days notice, order the removal of any foster child from the foster home in which he or she has been placed. Social Services Law §§ 383(2) and 400. After having been informed of

---

1. Pursuant to the provisions of 28 U.S.C. § 2281, this three judge court was convened to consider plaintiff's non-frivolous constitutional claims.

2. In recognition of the independent position advanced by Mrs. Buttenwieser, the term "plaintiff" will be used throughout this opinion to refer only to Offer and the foster parents although the foster children were also named in the complaint.

3. In a separate order, filed concurrently with this opinion, Judge Carter has granted the motion of both plaintiffs and intervenors for class certification. The following parties are thus represented in the instant litigation: All foster parents who have had a foster child live with them continuously for over one year; all foster children who have lived continuously with their foster parents for over one year; and all natural parents who have voluntarily placed children in foster care.

4. As will be discussed more fully below, New York City has revised its procedures during the course of this litigation.

5. Authorized agency is defined in New York Social Services Law § 371(10). It includes any local public welfare children's bureau, such as the defendants New York City Bureau of Child Welfare and Nassau County Children's Bureau, and any voluntary child-care agency under the supervision of the New York State Board of Social Welfare, such as the defendant Catholic Guardian Society of New York.

the impending removal in a printed notice, which contains no space for any detailed elucidation of the reasons for that removal, the foster parents may request a conference with a "public official" of the local social services department at which they have an opportunity to express their dissatisfaction with the agency's decision but no formal manner is provided whereby they may contest it. N.Y.C.R.R. § 450.14.

Although the foster parents may be accompanied to the conference by "a representative," they may not present or cross-examine witnesses, nor may they inspect the agency files even if records contained therein formed the predicate for the administrative decision. Yet, despite these handicaps, the burden is upon the foster parents to submit "reasons why the child should not be removed." The agency, by contrast, has no countervailing obligation to provide an articulated rationale for removing the child. N.Y.C.R.R. § 450.14. There is evidence in the record which indicates that rarely, if ever, do these pre-removal conferences result in the reversal of the initial decision. Post-removal, the foster parents are entitled to a "fair hearing," Social Services Law § 400(2), and then, if still "aggrieved" by the agency action, they may obtain judicial review.

Plaintiffs contend that these procedures deprive them of "liberty and property" interests without due process of law. The specific liberty interest which they assert is the right to familial privacy. E. g. *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Cognizant that each of the Supreme Court decisions in this area dealt with a more traditional, biological family, plaintiffs rely on several recent studies which functionally define the family as a psychological rather than a biological unit. Goldstein, Freud and Solnit, BEYOND THE BEST INTERESTS OF THE CHILD. Plaintiffs insist that after one year of foster care, emotional attachments have formed which the state should not be at liberty arbitrarily to upset. Plaintiffs further assert that the statistical evidence as to the length of the average child's stay in foster care creates an "informal tenure" system raising legitimate expectations that their role as foster parents will not be abruptly terminated.[6] *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). To illustrate the arbitrary manner in which they claim the outlined statutory provisions can operate, plaintiffs offer the example of their own personal involvement with the foster care system.

Madeline Smith is a 53 year old widow who lives in East Elmhurst, New York. She became an approved foster parent[7] under the supervision of the Catholic Guardian Society of New York in 1969. On February 1, 1970, she took Eric and Danielle Gandy into her home as foster children. At the time, Eric was four and Danielle two. Plaintiffs claim, and defendants do not dis-

---

**6.** In October 1974, the New York State Department of Social Services prepared Program Analysis Report No. 56, entitled "Time Spent in Care by Children Served in the New York State Foster Care Program 1973." The report calculated that "[t]he median length of stay for dependent and neglected children in foster care at the end of 1973 was 4.38 years," at p. 13. This raw statistic was placed in context by Prof. David Fanshell of the Columbia University School of Social Work who testified on the basis of his own longitudinal study that the probability of a foster child being returned to his biological parents declined markedly after the first year in foster care. Professor Fan-

shell's study, conducted over a five year period, revealed a decline in discharge rate, as follows:

| | |
|---|---|
| First year | 24% |
| Second year | 13% |
| Third year | 8% |
| Fourth year | 9% |
| Fifth year | 7% |

**7.** Foster parents boarding children in their home must be licensed annually by an authorized agency pursuant to a legislative scheme set out in New York Social Services Law § 375 et seq.

pute, that Danielle has never seen her natural mother and Eric no longer remembers her. Both children, who are legally free for adoption consider Mrs. Smith to be their mother.

Nevertheless, on March 29, 1974, Mrs. Smith was notified by letter from the Catholic Guardian Society that Eric and Danielle were to be removed from her care because "it is now in their best interests to leave your home." The agency's concern, not shared by Mrs. Smith, was that her arthritis would interfere with her undeniably well-meaning efforts to supervise the increasingly active behavior of Eric and Danielle. Although Mrs. Smith signed a waiver of her right to a pre-removal conference, she made it abundantly plain that she had no intention of surrendering the children. When told that they would be forcibly taken from her, she obtained a lawyer and began the instant litigation. To date, the children remain in Mrs. Smith's home—originally the result of a temporary restraining order, later the product of a voluntary stipulation among the parties.

Plaintiffs, Mr. and Mrs. Lhotan are similarly authorized foster parents; they, however, are under the supervision of the Nassau County Department of Social Services Children's Bureau. On September 4, 1970, Cheryl and Patricia Wallace were placed in the Lhotan home; two years later they were joined by their younger sisters, Cynthia and Cathleen. By all accounts, most notably that of the children, the reunion was a happy one for all concerned. Indeed, when Mrs. Lhotan was told on June 26, 1974 that the children were to be removed from her home ten days hence, the only reason given was that the four girls were growing too attached to their foster family. Mrs. Lhotan was informed that Cheryl and Patricia were to be returned to their biological mother while Cynthia and Cathleen were to be transferred to another foster home.

However, on July 8, 1974, in response to a request by the Lhotans, Judge Carter issued a temporary restraining order barring the removal of the children which had been scheduled for the next day. That order remained in effect until March 3, 1975, when it was dissolved by this court. Meanwhile, Mrs. Wallace, the biological mother, had begun habeas corpus proceedings in the state court to secure the return of her children. On February 23, 1976, the Appellate Division for the Second Department upheld a lower court ruling mandating immediate implementation of the plan devised by the Nassau County Department of Social Services Children's Bureau. The time for appeal of that decision has not yet passed.

Mr. and Mrs. Ralph Goldberg, the final set of plaintiff foster parents, face a less imminent threat. They have, since July 1969, taken care of Rafael Serrano, then six years old. Prior to his placement in the Goldberg home, Rafael had lived with a succession of foster families after having been abused by his natural parents during the time that he remained with them. Although the Goldbergs have been repeatedly told that they have done an excellent job in providing a healthy environment in which Rafael might grow and develop, they now fear, on the basis of various unofficial statements, that the Bureau of Child Welfare intends to remove Rafael and place him with his aunt. While the Goldbergs have yet to be officially notified of any such plan, they join in this action to insure that they will be entitled to a pre-removal hearing if and when such a decision is made.

Neither defendants nor intervenors dispute the strength of the emotional ties binding plaintiffs and their foster children nor the loss that will be felt if those ties are severed. Both defendants and intervenors insist, however, that the question now before us is and must be more narrowly focused. We agree. As a statutorily ordained court we must limit our inquiry to a determination of whether plaintiffs have established a deprivation of life, liberty or property sufficient to invoke the protections of the Due Process Clause.

■ We find no merit in plaintiffs' argument that the realities of the foster care system, as presently administered in New York State, justify their expectation that

their role as foster parents will not be abruptly and summarily terminated. See *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The most obvious and formidable obstacle to plaintiffs' contention is the agreement that each of them signed upon assuming responsibility for their respective foster children. The contract employed by the Catholic Guardian Society, typical of those used throughout the state, reserves to the agency the right to recall the child "upon request, realizing that such request will only be made for good reason." While such a provision is not dispositive, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the discretionary authority which it vests in the agency is on its face incompatible with plaintiffs' claim of legal entitlement. We are unpersuaded by plaintiffs' efforts to equate an open-ended relationship with one of indefinite duration. Nor does evidence showing that the average child placed in foster care remains within the system for approximately 4½ years[8] support the plaintiffs' position. Cf. *Perry v. Sindermann,* supra.

We find considerably more difficult plaintiffs' assertion that the foster home is entitled to the same constitutional deference as that long granted to the more traditional biological family.[9] Plaintiffs base their contention upon several recent studies which conclude that the "family" can best be conceived as a psychological entity, uniquely characterized by the emotional interdependence of each of its members. E. g. Goldstein, Freud and Solnit, BEYOND THE BEST INTERESTS OF THE CHILD. Plaintiffs argue that it is this interdependence, born out of daily and intimate contact, which best explains the family's preeminent constitutional position. Plaintiff foster parents further insist that their relationship with their foster children fully satisfies this functional definition, although custody of the child is vested in the authorized agency. Social Services Law § 383(2). They point to decisions such as *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), which, they claim, indicate the Supreme Court's willingness to look behind legal formalities when inquiring into the existence of a fruitful family life.[10]

While the intervenors and defendants rely on precisely the same Supreme Court opinions, they emphasize that the holding of each was limited by its facts to biological families. Intervenors, in particular, strongly protest any impliciation that the contractual relationship between foster parent and foster child is, or ever can be, the equivalent of the relationship between a mother and the child to whom she has given birth.[11]

---

8. See note 5, supra.

9. "The Court has frequently emphasized the importance of the family. The right to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska,* 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923), 'basic civil rights of man,' *Skinner v. Oklahoma,* 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942), and '[r]ights far more precious . . . than property rights,' *May v. Anderson,* 345 U.S. 528, 533 [73 S.Ct. 840, 843, 97 L.Ed. 1221] (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince v. Massachusetts,* 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska,* supra, 262 U.S. at 399 [43 S.Ct. at 626], the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma,* supra, 316 U.S. at 541 [62 S.Ct. 1110 at 1113] and the Ninth Amendment, *Griswold v. Connecticut,* 381 U.S. 479, 496 [85 S.Ct. 1678, 14 L.Ed.2d 510] (1965) (Goldberg, J., concurring)." *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972).

10. In *Stanley,* the Supreme Court invalidated a provision of Illinois law which made the children of unwed fathers wards of the State upon the death of the mother. The Court held that, absent a hearing, the state was prohibited from presuming that the father would be an unfit parent merely because he had never married.

11. The defendant Catholic Guardian Society currently pays foster parents $155 per month for each foster child boarded in their home, in addition to an allowance for clothing, medical and dental expenses. This amount is typical of that paid throughout the state.

Intervenors have introduced affidavits from eminent experts in social work and psychology which attack the validity of the concept of the "psychological family." [12] The intervenors also argue that this court would be ill-advised to create a precedent which might later be applied to other foster families less concerned and well-intentioned than those now before us.

We agree with the parties that this debate as to the definition of the family and its role in society is an interesting and important one. We need not and should not, however, reach out to decide such novel questions when narrower grounds exist to support our decision. See *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688, 707–708 (1936) (Brandeis, J., concurring).

■ We believe that the pre-removal procedures presently employed by the state are constitutionally defective. We hold that before a foster child can be peremptorily transferred from the foster home in which he has been living, be it to another foster home or to the natural parents who initially placed him in foster care, he is entitled to a hearing at which all concerned parties may present any relevant information to the administrative decisionmaker charged with determining the future placement of the child.[13] While our decision today is perforce limited to the class as defined in Judge Carter's accompanying certification order, namely all children in foster care for one year or longer, we note that similar interests suggest a similar result whenever the child is placed in a foster home for long term care.[14]

■ The time has long since passed when children were considered mere chattels of the adults with whom they lived. The foster care system itself, initiated in New York in the latter part of the nineteenth century, represented a large step forward from the prior practice of institutionalizing children with the poor and feebleminded or boarding them out as apprentices or indentured servants. In any event, it is by now well-settled that children are "persons" within the meaning of the Fourteenth Amendment whose rights are entitled to protection against state abridgement. *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S. Ct. 733, 21 L.Ed.2d 731 (1969); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Foremost among those rights, as the Supreme Court has repeatedly held, is the right to be heard before being "condemned to suffer grievous loss," *Joint Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 645–46, 95 L.Ed. 817, 852 (1951) (Frankfurter, J., concurring).

The basis of this right is easily understood. A hearing dispels the appearance and minimizes the possibility of arbitrary or

12. Plaintiffs have introduced affidavits from similarly eminent experts equally fervent in their support of the concept of the "psychological family."

13. Judge Pollack concludes his dissenting opinion with the observation that Social Services Law § 383(3) already "embodie[s] through the right of intervention" the requirement that a pre-removal hearing be provided if the foster child has lived with his foster parents for more than two years. This statement is incorrect. An examination of § 383(3) plainly reveals that while it grants to foster parents the right to intervene in any "proceeding" concerning the custody of foster children who have resided with them for twenty-four months or longer, it does not purport to create any substantive entitlement to a "hearing" or "proceeding" not elsewhere provided. Judge Pollack's contrary

interpretation of the statutory language is moreover belied by the current practices of the defendants. Furthermore, the right to intervention granted by § 383(3) extends to foster parents only and not to the children themselves.

We therefore emphasize once again that, with the exception of the recently amended regulations in effect in New York City, it is presently the law throughout New York State that a pre-removal hearing is unavailable regardless of the duration of the foster relationship being terminated.

14. Our disposition of this case makes it unnecessary to decide the claim of the foster parents that the challenged statutes and regulations deprive them of the equal protection of the laws.

misinformed action. *Goldberg v. Kelly*, 397 U.S. 254, 266, 90 S.Ct. 1011, 1019–20, 25 L.Ed.2d 287, 298 (1970). In cases such as these, the harmful consequences of a precipitous and perhaps improvident decision to remove a child from his foster family are apparent. Plaintiffs' experts assert that continuity of personal relationships is indispensable to a child's well adjusted development. We do not need to accept that extreme position to recognize, on the basis of our common past, that the already difficult passage from infancy to adolescence and adulthood will be further complicated by the trauma of separation from a familiar environment. This is especially true for children such as these who have already undergone the emotionally scarring experience of being removed from the home of their natural parents.

Intervenors dispute the seriousness of these losses, relying principally on a longitudinal study conducted by Professor David Fanshell of the Columbia University School of Social Work in which he concluded that there was no statistically significant correlation between a child's successful development and the number of times that child was moved within the foster care system. We find significant, however, Prof. Fanshell's further testimony that, "as a professional, [I] would be against the capricious movement of children." The requirement of a hearing is designed to insure no more.

Most specifically, a hearing is not, as intervenors apparently fear, intended in any way to impede the right of biological parents to regain custody of their children. The law in New York is clear: in the absence of abandonment, formal surrender for adoption or demonstrated unfitness, the "primacy of parental rights may not be ignored." *People ex rel. Kropp v. Shepsky*, 305 N.Y. 465, 469, 113 N.E.2d 801, 804 (1953); see also *Spence-Chapin Adoption Service v. Polk*, 324 N.Y.S.2d 937, 274 N.E.2d 431. We do not, by our holding today, disturb that local judgment.[15]

Nonetheless, we are unable to agree with intervenors' contention that a hearing is therefore superfluous when a foster child is to be returned to his biological parents. Even under such circumstances, a hearing performs the salutary function of providing the agency with an organized forum in which to gather information concerning, inter alia, the frequency with which the biological parent has been visiting his or her child. If the evidence discloses that, despite the diligent efforts of the agency, the biological parent has failed for more than a year to maintain "substantial and continuous contact" with a child in foster care, permanent neglect proceedings may be instituted and the biological parent's presumptive right to custody may be forfeited. Family Court Act § 611 et seq.; *In re P.*, 71 Misc.2d 965, 337 N.Y.S.2d 203 (Fam.Ct. N.Y.Co. 1972). A fortiori, when the question is whether a foster child is to be moved from one foster home to another, the state in its parens patriae capacity, will be better able to make an informed decision after a hearing at which all relevant information has been presented. The interest of the state, as parens patriae, is therefore compatible with, rather than antagonistic to, the requirement of a hearing. *Goldberg v. Kelly*, 397 U.S. at 265, 90 S.Ct. at 1019, 25 L.Ed.2d at 297–98.

Plainly, the present pre-removal conference is not designed adequately to fulfill this data-gathering function. As outlined earlier, the foster parents are denied any right to present evidence or witnesses, the public official with whom they confer is already acquainted with the agency's version of the background facts, and the foster child whose future is at stake does not participate. Such a scheme fails to satisfy even the most minimal requirements of procedural due process. *Escalera v. New York City Housing Authority*, 425 F.2d 853 (2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970). We do not understand the defendants seriously to claim otherwise.

---

**15.** Accordingly, we see no basis for intervenors' doomsday projection that biological parents who might otherwise entrust their children to the foster care system will be discouraged from doing so, to the detriment of the child, by the decision in this case.

Rather, the state argues that any constitutional defect is remedied by the post-removal "fair hearing" provided under N.Y.C.R.R. § 450.14. We disagree. See *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). It is, at the least, paradoxical to suggest that a hearing designed to forestall the hasty and ill-advised separation of a foster child from his foster home can occur after that separation has already taken place. We are unpersuaded by defendants' contention that a decision by the hearing examiner to reverse the agency's action and reunite the family effectively restores the status quo. Such a reunion may ameliorate but it cannot eradicate the injury caused by uprooting the child. Indeed, to the degree that implementation of the hearing examiner's decision requires the disruption of arrangements made in the interim, it may further exacerbate the child's sense of loss. It is in the best interests of the child that the risk of such dislocations be avoided or minimized.[16]

We find equally without merit intervenors' assertion that § 392 of the Social Services Law adequately protects the due process interests of the foster child. Enacted in 1971, § 392 provides for periodic review of the status of each foster child. One and a half years after being placed in foster care, and every two years thereafter, the Family Court is required to conduct a hearing upon notice to the biological parents, foster parents in whose home the child has lived for at least eighteen months, the child care agency to which the child has been surrendered, and "such other persons as the court may, in its discretion, direct." Following the hearing, an order must be entered incorporating one of four stated dispositional alternatives: that the child be continued in foster care, that he be returned to his natural parents, that proceedings be instituted legally to free him for adoption or, if legally free already, that he be placed for adoption with specified individuals.

Intervenors' contend that the above procedure, when coupled with the continued jurisdiction of the Family Court, Social Services Law § 392(10), fully satisfies constitutional requirements. We do not agree. Cf. *Boone v. Wyman*, 295 F.Supp. 1143 (S.D. N.Y.1969), aff'd, 412 F.2d 857 (2d Cir. 1969), cert. denied, 396 U.S. 1024, 90 S.Ct. 600, 24 L.Ed.2d 518 (1970).

First, and most obviously, § 392 offers no comfort whatsoever to the child in foster care for less than eighteen months. Second, intervenors' reasoning appears to rest upon an unjustifiably expansive interpretation of the scope of § 392. In *In re W.*, 77 Misc.2d 374, 355 N.Y.S.2d 245, 248 (Fam.Ct. N.Y.Co. 1974), the court concluded that the power to direct the child to be continued in foster care did not encompass the authority to order that the child be maintained in any specific foster home.

Third, and most fundamentally, intervenors assume an identity of interest between foster parent and foster child which we are unwilling to accept as we have already indicated by the appointment of separate counsel at the outset of this litigation. The continuing jurisdiction of the Family Court constitutes a safeguard against arbitrary state action only if the proposed removal of the foster child is brought to the court's

---

16. Nor do we find anything to the contrary in the Supreme Court's recent holding that an evidentiary hearing is not required prior to the termination of disability benefits. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, 44 U.S.L.W. 4224 (1976). Writing for the majority, Justice Powell emphasized the limited and financial nature of the deprivation there suffered by the plaintiff and the necessarily heavy reliance by the agency on medical documentation in reaching its decision. In contrast, the emotional trauma felt by a young child moved from a familiar home is pervasive and potentially devastating. Moreover, in determining whether the best interests of the child would better be served by his removal to another foster family, the social worker must weigh and evaluate a "wide variety of information," much of it subjective and some of it biased. 424 U.S. at 343, 96 S.Ct. at 907, 47 L.Ed.2d at 38, 44 U.S.L.W. at 4232. A hearing provides the procedure for gathering and evaluating such data, thereby minimizing the risk of error.

attention. Intervenors posit that the foster parents will perform this function. They may well be correct in the majority of cases. But we decline to rest the rights of the foster children upon the shoulders of foster parents who, however well-meaning, have a personal involvement and perhaps a financial interest [17] which may color their conduct. If a hearing is required, as we hold it is, it is required in all cases and cannot be made to depend upon the initiative of third persons.[18]

A similar flaw taints the amended regulations promulgated by New York City during the pendency of this action. In most other respects, however, New York City's revised procedures represent a significant improvement over the agency conference and post-removal hearing envisaged by N.Y.C.R.R. § 450.14 and already discussed.

As of July 1, 1974, New York City has provided, at the foster parents' request, as a substitute for or supplement to the agency conference, a pre-removal "independent review" conducted "in accordance with the concepts of due process." Its salient features, as set forth in an internal memorandum of August 5, 1974, are as follows: (1) the review is heard before a supervisory official who has had no previous involvement with the decision to remove the child; (2) both the foster parents and the agency may be represented by counsel and each may present witnesses and evidence; (3) all witnesses must be sworn, unless stipulated otherwise, and all testimony is subject to cross-examination; (4) counsel for the foster parents must be allowed to examine any portion of the agency's files used to support the proposal to remove the child; (5) either a tape recording or stenographic record of the hearing must be kept and made available to the parties at cost; and (6) a written decision, supported by reasons, must be rendered within five days and must include a reminder to the foster parents that they

may still request a post-removal hearing under N.Y.C.R.R. § 450.14.

While the amended regulations represent a considerable improvement over previous procedures, we note certain deficiencies still present in New York City's current practices. First, as alluded to above, the "independent review" now afforded by New York City is available only upon the affirmative request of the foster parents. We reiterate that such a restriction is inconsistent with our holding that it is the child's right to avoid arbitrary dislocations which necessitates a hearing. Whatever hearing is provided should be provided as a matter of course.

Second, New York's amended regulations have no applicability whatsoever when the child is to be returned to his biological parents. We see no basis for this distinction which, we believe, erroneously confuses the standard by which evidence is to be judged and the process by which it is gathered. No matter where he is to be placed, a well informed decision cannot but help to promote the child's "best interests," which all parties seek to advance.

Third, it is unnecessary and likely counterproductive to provide duplicate hearings, one pre-removal and a second after the event. We recognize that New York City was operating within the constraint of a statewise regulation, N.Y.C.R.R. § 450.14, which it had no authority to abrogate. We note, however, that the welfare of the child is best served by a speedy and final decision as to his fate.

Fourth, participation in New York City's "independent review" is limited to the foster parents and the agency representative. In order to insure that all relevant information is presented to the hearing examiner, the child and biological parent should be heard as well. Moreover, it may be advisa-

---

17. See note 10, supra.

18. It is for this reason that we are unable to agree with intervenors' assertion that a constitutionally adequate recourse is provided the foster parents through a petition for habeas

corpus or a petition for custody under Family Court Act § 651, even assuming, arguendo, that the above remedies would be available to a foster parent prior to the removal of the foster child.

ble, under certain circumstances, for the agency to appoint an adult representative better to articulate the interests of the child. In making this determination, the agency should carefully consider the child's age, sophistication and ability effectively to communicate his own true feelings.

It is not, however, necessary that the chosen representative be an attorney. "The insertion of counsel . . . would inevitably give the proceeding a more adversary cast," *Wolff v. McDonnell*, 418 U.S. 539, 570, 94 S.Ct. 2963, 2981, 41 L.Ed.2d 935, 959 (1974), which as Mrs. Buttenwieser points out, might well impede the effort to elicit the sensitive and personal information required. Thus, we do not hold that a trial-type hearing, such as that now provided in New York City, is constitutionally requisite. See *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Indeed, we are reluctant to impose any pre-ordained structure upon the endeavor of trained social workers to evaluate the often ambiguous indices of a child's emotional attachments and psychological development. Rather, we believe the sounder course is to allow the various defendants—state and local officials—the first opportunity to formulate procedures suitable to their own professional needs and compatible with the principles set forth in this opinion.

In summary, therefore, we conclude that New York Social Service Law §§ 383(2) and 400, and N.Y.C.R.R. § 450.14, as presently operated, unduly infringe the constitutional rights of foster children. Defendants are enjoined from removing any foster children in the certified class from the foster homes in which they have been placed unless and until they grant a pre-removal hearing in accord with the principles set forth above. Of course, our decision today does not in any way limit the authority of the State to act summarily in emergency situations. Family Court Act § 1021.

The court thanks Mrs. Helen L. Buttenwieser for her valuable assistance as assigned counsel.

Order to be taken on submission.

POLLACK, District Judge (dissenting):

This is a suit seeking declaratory judgment that New York (SSL) §§ 383(2) and 400 and Title 18, New York Codes, Rules, and Regulations (N.Y.C.R.R.) § 450.14 are unconstitutional on their face and as applied and seeking injunctive relief against their enforcement. The complaint is grounded on allegations that the sections, which prescribe procedures for the separation of foster children from their foster parents, deprive plaintiffs of due process and equal protection in violation of the Fourteenth Amendment. For the reasons shown hereafter the complaint must be dismissed.

The present statutory scheme, applicable throughout most of the state, provides that the local Public Welfare Department or any authorized private agency acting on its behalf may, at any time up to two years after a child has been placed in foster care, in its discretion and on ten days' written notice, order the removal of any foster child from the foster home in which he or she has been placed. SSL §§ 383(2), (3), 400 (1976 Supp.). Following notice of the impending removal, the foster parents may request a conference with a social services official and are given the reasons for removal and have an opportunity to express their views thereon. The child may not be removed from the foster home until three days after the conference. Written notice of the decision must be sent to the foster parents no later than five days after the conference which must contain advice of their right to appeal to the Department. N.Y.C.R.R. § 450.14(a–e). A decision to remove may be appealed to the Department, by "any person aggrieved", and the Department must review the case, give the appellant an opportunity for a fair hearing and render a decision within thirty days. SSL § 400(2) (1976 Supp.). A foster parent has been held to be an "aggrieved person" and where administrative remedies are finally exhausted, Court review is available by way of an Article 78 proceeding, CPLR 7801 *et seq.*, before the New York Supreme Court. *In re W*, 77 Misc.2d 374, 355 N.Y.S.2d 245

(Family Ct.N.Y.Co.1974). Additionally, after 24 months of foster parentage the foster parents are granted the statutory right to "intervene" in any proceeding involving the custody of the child. SSL § 383(3) (1976 Supp.). Habeas corpus review is also presumably available at the instance of either the foster parent or the foster child. N.Y. CPLR §§ 7001 *et seq.*[1]

The foster-parent-plaintiffs contend that these procedures deprive them of "liberty and property" interests without due process of law. The specific liberty interest which they assert is the right to familial privacy.

Plaintiffs insist that *after one year* of foster care, no child should be removed from a foster home without prior notice and an adversary hearing because emotional attachments have formed by that time which the state should not be at liberty arbitrarily to upset.

Plaintiffs-foster-parents initially sought to represent, as "next friend," the interests of their foster children as well. However, to forestall any possible conflict of interest, Judge Carter appointed Helen L. Buttenwieser as independent counsel for the foster children. In that capacity she has consistently argued that the foster parents have no constitutionally cognizable interest independent of those of the foster children and that an adversary hearing is not the proper forum to determine the "best interest of the child."

The plaintiffs-foster-parents, in attempting in this action to obtain rights to certain procedures before a child may be removed from their home, no matter what the circumstances of the foster parents' home, are in effect seeking legislative relief.

Since the commencement of this law suit, New York City has revised its removal procedures when the child is to be placed somewhere other than with its own parents. These new procedures grant to foster parents most of the procedural protections requested by plaintiffs in this law suit: a foster parent receives detailed notice of the intent to remove a child, the reasons for the intended removal, and the right to a fair hearing by the City's Department of Social Services. The foster parents have access to Agency reports to be used at the hearing. Foster parents can present and cross-examine witnesses. The Agency determination must be based only on the record; its written decision must be served within five days of the hearing; and the child cannot be moved in the interim. A recording of the hearing is made and is available at cost.

All members of the Court agree that there is no merit in plaintiffs' argument that the realities of the foster care system, as presently administered in New York State, justify the finding of an expectation akin to a "property interest" that their role as foster parents will not be abruptly and summarily terminated. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Each foster parent signed, upon assuming responsibility for his or her respective foster child, a contract which reserves to the Agency the right to recall the child "upon request, realizing that such request will only be made for good reason." [2]

Moreover, plaintiffs' assertion that the foster home is entitled to the same constitutional deference as that long granted to the more traditional biological family because recent studies conclude that the "family"

---

1. Under Social Services Law § 392 (1976 Supp.) the New York Family Court is required to hold a hearing to review the foster care status of any foster child after 18 months of continuous care in the same foster home and, then, at least every 24 months. The foster parents are made parties "entitled to participate in the proceeding." § 392(4) (1976 Supp.).

2. The statutes outlined above and under attack here also fairly put the foster parents on notice of the State's right to summarily remove the

child from the foster home within 24 months of foster parentage. Of course, the observations in the text above are principally relevant with respect to an assertion of an "entitlement" to the children or the foster parent-child relationship. Such a property-like interest is to be distinguished from an assertion of a "liberty" interest similar to that asserted in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

can best be conceived as a psychological entity, presents a novel question and an interesting social debate. The plaintiffs seemingly ask this Court to extend to them the due process protection afforded to the biological father of an illegitimate child in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Such an extension would adopt a principle that has long been anathema to the State's foster care policies. The psychological parent/child relationship is an amorphus one, not something that can be precisely defined or explained. The New York Courts have virtually unanimously refused the notion of "common law adoption" and have stated that, in absence of a statutory scheme, adoption—that is the means whereby the status or relationship of parent or child is created between persons not so related by nature—is not permitted. *Matter of Malpica-Orsini,* 36 N.Y.2d 568, 570, 370 N.Y.S.2d 511, 331 N.E.2d 486 (1975); *Landon v. Motorola, Inc.,* 38 A.D.2d 18, 326 N.Y.S.2d 960 (3d Dept. 1971).[3]

**3.** The Appellate Division of the Second Department has recently refused to reverse a Trial Term decision ordering two of the plaintiffs in this action to return their foster children to their natural mother. *State ex rel. Wallace v. Lhotan,* 51 A.D.2d 252, 380 N.Y.S.2d 250 (2d Dept., 1976). In that decision the Court discussed part of the rationale behind the rejection of the concept of common-law adoption in the case of foster parents.

  . . . the foster parents must make a serious attempt to encourage, not discourage, the improvement of relations between the children under their charge and a mother who is trying to reestablish the bonds of family love and concern. A portion of the love that foster parents have for the children must be directed towards easing their return to their natural parent. Whatever circumstances will rend the family fabric, it should not be the result of actions of the foster parents, who have taken on their delicate responsibilities on the solemn promise to do otherwise.

So it is that foster parents are charged with the duty to avoid forming the very psychological relationship which they present here as a justification for a pre-removal hearing.

**4.** The Supreme Court has frequently expressed the general rule that one person does not have standing to assert the constitutional rights of another. *United States v. Raines,* 362 U.S. 17, 21–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *Tile-*

Having decided that the foster parents have no entitlement to their foster children, the Court declines to decide the debate surrounding the plaintiffs' requested extension of *Stanley v. Illinois, supra*; an extension which would invest plaintiffs with a "liberty" interest either in the children or the relationship itself. Instead of entering that debate, the Court departs from the better part of plaintiffs' claims, focused as they are on allegations of unconstitutionality from the viewpoint of the foster parents. The Court then rests its decision on a characterization of the foster children's interest that has been denied by the children's representative, Mrs. Buttenwieser. The Court's opinion anticipates a question of constitutional law in advance of the necessity of deciding it. It holds over the objection of the representative of the children in this suit that the foster children have a "liberty" interest in their relationship with the foster parents. The position of the children taken by the Court is espoused only by the foster parents who have no standing to assert the children's interest.[4] No one

*ston v. Ullman,* 318 U.S. 44, 46, 63 S.Ct. 493, 87 L.Ed. 603 (1943). *See generally, Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). In light of the representation of the children by Mrs. Buttenwieser and the Court's holding that an independent representative is required for the foster child at the due process hearing it orders, there can be no grounds for waiving this general rule in this case.

By its appointment of Mrs. Buttenwieser the Court has recognized the *severability* of the claims of foster parents and the foster children. See Rule 17(c), Fed.R.Civ.P.; 6 Wright and Miller, *Federal Practice and Procedure* § 1570, at 774 (1971). Therefore the foster parents cannot now be invested with standing as an exception to the *Raines* rule on the ground that their interests are not severable from those of the children. *See* Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court,* 71 Yale L.J. 599, 606 *et seq.* (1962); Note, *Standing to Assert Constitutional Jus Tertii,* 88 Harv.L.Rev. 423 (1974).

The Court's recognition of some interest in the children other than that asserted by their independent representative herein betrays a significant confusion over the question of when a child does and does not require independent representation under the Due Process Clause. Apparently a child requires an independent representative in the hearing required by the

with standing to claim that the children require the due process protection sought herein is making that claim and, therefore, on well-settled principle it is not necessary or appropriate to reach that issue.

> "The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.' *Liverpool, N. Y. & P.S.S. Co. v. Emigration Commissioners,* 113 U.S. 33, 39; 5 S.Ct. 352, 355, 28 L.Ed. 899; *Abrams v. Van Schaick,* 293 U.S. 188; 55 S.Ct. 135, 79 L.Ed. 278; *Wilshire Oil Co. v. United States,* 295 U.S. 100. 55 S.Ct. 673, 79 L.Ed. 1329. 'It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to the decision of the case.' *Burton v. United States,* 196 U.S. 283, 295." 25 S.Ct. 243, 245, 49 L.Ed. 482. *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–7, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).[5]

On the basis of its resolution of this anticipated question the Court decides that the preremoval procedures presently employed by the State are constitutionally defective in that a child is entitled to a hearing "whenever and as soon as the child has been placed in a foster home for long term care or whenever, for any reason, he has remained in a foster home for a period of one year or more." Pursuing this result, which has every earmark of legislative action, the Court rules that "defendants are enjoined from removing any foster children from the foster homes in which they have been placed for long term care or in which they have lived for more than one year unless and until they grant a preremoval hearing." *

Realizing that it is moving into unchartered seas, the Court states "we are reluctant to impose any pre-ordained structure upon the endeavor of trained social workers to evaluate the often ambiguous indices of a child's emotional attachments and psychological development. Rather, we believe the sounder course is to allow the various defendants—state and local officials—the first opportunity to formulate procedures suitable to their own professional needs and compatible with the principles set forth in this opinion."

This result will undoubtedly come as a surprise, if not a shock, to the parties. No one has contended for the view reached in the Court's opinion, except possibly to touch on the subject matter tangentially. The parties should certainly have been given a hearing (a briefing opportunity) on the point made by the opinion. They should have been alerted to the possibility that the Court might undertake to consider the "unconstitutionality" of the present procedures from the viewpoint of the foster children, whose representative was not asserting any such contention.

If the Court must reach the interest of the children, it must face a situation in which at every step in the foster care system (whether before or after the 24 month period) the child is represented only by the State or by the foster parents. He receives no notice and has no independent representative at any stage; in short, he has no independent role. Therefore, if the question were properly presented, the Court would have to decide whether or not the State, in its *parens patriae* capacity, acts as a sufficient representative for the child and whether or not the Due Process Clause

---

Court despite the views of the children's independent representative in the hearing of this action. In short, allowing foster parents standing here to assert the interest of the children seriously undermines the Court's later finding that the children require representation independent of the foster parents at a due process hearing.

5. This principle of constitutional jurisprudence is precisely the authority invoked by the Court in its avoidance of the debate surrounding plaintiffs' analogy to *Stanley v. Illinois, supra. See generally Rescue Army v. Municipal Court,* 331 U.S. 549, 568–75, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

* The Court's draft opinion was as quoted above. It has since limited its holding to apply to only those foster children who have resided with one set of foster parents for at least a year. The dissent is nonetheless the same.

mandates as adversarial hearing for foster children.

Since an independent representative for the child will inevitably be required, the Court has imposed on the delicate system of foster care an inapposite model for the application of the Due Process Clause; a model which requires the balancing of the individual's apparent need for procedural safeguards and the State's apparent need for summary action.[6]

The very structure of the State's foster care system belies the applicability of this model. In a system that at least purports (and the evidence herein shows that it actually does) represent "the best interests of the child" there can be no such facile distinction between the interest of the child, on the one hand, and that of the State, on the other. Unlike the traditional context in which the Due Process Clause has been litigated, there is no necessary opposition between the child and the State here. The State's professional social workers should not so easily be rejected as adequate representatives for foster children (if in this context the Due Process Clause requires strict "representation" at all). Their representation of those children has simply not, on the hearing of this case, been shown to be so inadequate as to require the introduction of a third party to represent the child.

The interests involved in this system of child care are too sensitive, too inchoate, to fit this old due process model; and there seems little doubt that this case presents a striking example of the need for flexibility in the application of the Due Process Clause.[7] Neither the Court's adherence to the old Due Process approach by requiring an independent representative, nor its refusal to provide further guidelines for the type of hearing it envisions, taps the potential for such flexibility.

If the Court has, in fact, improperly required a third party to represent the child, then the remainder of its analysis can only be described as legislation. In holding that the child's interest requires that the foster parents have a formal voice in any decision to remove the child after a year of foster parentage or whenever the child is placed with them for "long term care," the Court first undertakes to express a social policy preference for a one year rather than the present statutory two year period, and then hedges by promulgating a vague standard (as yet undefined in this system) apparently meant to test foster parent-child relationships from their incipiency. There is no support for such a use of the Fourteenth Amendment.

Rather than relying on the disinterested social judgment of professional social workers acting under the aegis of well-conceived tried and tested statutes, the Court's decision embroils the child in legalistic, psychological theorism; leaving the child a pawn in a game from which the child should be spared. No evidence has shown that the present procedures are conducive to or have resulted in hasty or ill-advised separations from the viewpoint of the foster child.

6. *See Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Note, *Specifying the Procedures Required By Due Process: Toward Limits on the Use of Interest Balancing,* 88 Harv.L.Rev. 1510 (1975).

7. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. . . . what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. . . . ' "[D]ue proc- ess," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' It is 'compounded of history, reason, the past course of decisions . . . .' *Joint Anti-Fascist Comm. v. McGrath,* 341 U.S. 123, 162–163 [71 S.Ct. 624, 643, 95 L.Ed. 817] (concurring opinion)." *Cafeteria & Restaurant Workers, Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). *See also, Frost v. Weinberger,* 515 F.2d 57, 66 (2d Cir. 1975); *Friendly, H. J.,* "Some Kind of Hearing", *123 U.Pa.L.Rev. 1267 (1975); Frankel, M.,* The Search for Truth: An Umpireal View, *123 U.Pa.L.Rev. 1031, 1036 (1975).*

The right of cross-examination and discovery procedures, which would presumably now be afforded to foster parents after one year, have not been shown to be in the best interests of the child.

I do not imply in any wise that a child should not have the right to be heard—to participate. That is not what is at stake. The only question before the Court is whether layers of procedural obstruction should be afforded to the foster parents to impede judgments reasonably reached by concerned independent disinterested agencies and professionals by less starchy methods. The preremoval conference and the procedures leading thereto are not in any instance shown to have been defective from the viewpoint of the foster child. It is unrealistic to expect that a pre-teenage child, for example, is to invoke the "hearing" contemplated by the majority decision. And if an appointed adult representative is needed to articulate the interest of the child—the existing procedures accord the needed due process.

The State legislature which spawned the statutory scheme that makes the foster parent-child relationship possible has made the rational decision that until it is 24 months old this relationship can never be sufficiently strong to require pre-termination hearing protection. While the Court should not abdicate its constitutional responsibilities or improperly defer to a state legislature, the Court should not overturn the legislature's decision absent adequate proof that it is irrational or unfair. In short, it can recognize the State legislature's superior fact-finding ability and it can agree with that legislature's decision without avoiding its obligation to determine what does and does not satisfy the Due Process Clause.

The Supreme Court has warned against a return to the days of substantive due process.

Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation. There was a time when the Due Process Clause was used by this Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy. . . . We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. . . . We refuse to sit as a "superlegislature to weigh the wisdom of legislation," and we emphatically refuse to go back to the time when courts used the Due Process Clause "to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." . . . . The . . . statute may be wise or unwise. But relief, if any be needed, lies not with us but with the body constituted to pass laws for the State . . . . *Ferguson v. Skrupa,* 372 U.S. 726, 729–732, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1963).

This warning applies equally well to the social as to the economic sphere. While (in the first two years of foster parentage) it may conceivably be wiser to hold a pre-termination hearing to hear the parties out, it is not, thereby, constitutionally required. The evidence has not shown that, during those first two years, the foster parents and the foster child are not afforded adequate due process. The choice of providing a pre-termination hearing after one year of foster parentage rather than the two year period now embodied in SSL § 383(3) through the right of intervention, is a choice that seems particularly legislative in character.

I would dismiss the complaint.