OPINION OF THE COURT
Marjorie C. Mix, J.
At issue is the present foster care status of Kevin M., born *821 on January 21, 1993. During a recent witnessed hearing regarding the discontinuation of parental visitation, the court was informed that Kevin has been removed from school by the foster parents, has manifested serious psychological problems, and is not receiving psychological or psychiatric treatment. Further, the testimony of the court-appointed psychological evaluator indicated that Kevin has been enabled in his identification of his foster placement with the Doe[1] family as a permanent home, and is being permitted to identify himself as “Michael Doe,” although his parent’s rights have not been terminated. (See, decision and order, entered Jan. 25, 2001, discussed infra.)
In order to address the above matters, a witnessed hearing was held regarding Kevin’s foster care placement on February 27, 2001. Present were counsel for the Erie County Department of Social Services (hereinafter the Department), respondent mother Danielle S. and her counsel, foster parent Lorie Doe and her counsel, and the Law Guardian.
Background[2]
On January 19, 2001, a hearing was held on the motion of the Erie County Department of Social Services and the Law Guardian to suspend parental visitation as contrary to the best interests of Kevin and his sister, who are placed in separate foster homes. At that hearing, the Department presented the testimony of licensed clinical psychologist Dr. Eloise O’Brien, who was appointed to conduct a psychological evaluation relative to visitation issues on the consent of all parties. In its January 25, 2001 decision and order, the court recapitulated Dr. O’Brien’s testimony:
“Dr. O’Brien described Kevin as a timid child, with extreme fears of his biological mother and a number of mechanisms and myriad rituals he has developed for disguising himself to protect himself from her. Seven year-old Kevin insists on being known as ‘Michael Doe’, wears jingle bells to bed at night in *822 fear of being kidnaped by Respondent S., and has shaved his head and wears glasses in order to be unrecognizable to her. Described by Dr. O’Brien as having extreme fears and anger at Respondent S., Kevin insists that she tried to kill him and Kelsie and that he can remember an incident when his mother threw Kelsie against a wall. While Dr. O’Brien observed that Kevin’s account of this incident has changed over time, and that adult suggestions can result in ‘helping a story along’, Kevin’s belief in the story and his fear are very real.”
After deciding the motion for the discontinuation of parental visitation, the court addressed the issues related to Kevin’s present foster care status:
“Dr. O’Brien’s testimony raises concerns regarding the history and present circumstances of Kevin’s foster care placement. Kevin does hot consider his present placement to be a foster home, and identifies his present foster mother as his ‘real mom’ and her children as his real siblings. This suggests that the foster family has persistently treated him as a child of the family, and that the Department has done little to discourage this treatment. It appears that the foster parents have not properly equipped Kevin to understand his situation, perhaps because the family was inaccurately and improperly told by the Department caseworker at the time of placement that there was ‘zero chance’ that Kevin would be returned to his parents. (Court Exhibit 1, p. 3.) Dr. O’Brien’s testimony also suggests that Kevin has had adult assistance in ‘helping the story along’ regarding Respondent S.’s past abusive conduct, raising questions as to who may have prompted and encouraged such parental alienation. Thus, it preliminarily appears that in addition to being harmed by parental abuse, Kevin may have also been harmed by inappropriate continuing care.”
“Further, it is reported to the Court that Kevin is being home schooled; particularly in view of Kevin’s significant emotional problems, the Court is concerned that this foster care child is not receiving the professional intervention which could be provided by certified educators and psychologists, and is being deprived of the broader opportunities for *823 socialization in a traditional school setting. These issues, manifest on the record, warrant an expeditious review and hearing regarding the foster care status of Kevin M.” (Decision and order, entered Jan. 25, 2001.)
Accordingly, in addition to granting the motion of the Department and the Law Guardian to discontinue parental visitation for reasons elsewhere discussed in the decision and order, the court further ordered that a review and hearing regarding the foster care status of Kevin M. be held on February 27, 2001.
The Foster Care Status Hearing
At the February 27, 2001 foster care status review hearing, the Law Guardian presented the testimony of Kevin’s counselor Jean Gauthier, foster care provider Lorie Doe, and caseworker Cherri Carroll. The Department, the respondent, and the foster parent did not present witnesses.
Jean Gauthier testified that she is affiliated with the Niagara Life Center in Fort Erie, Ontario, where she works with youth and provides family and children’s services. Ms. Gauthier was an undergraduate at George Brown College, where she received a “Child Worker” diploma, and completed one year of a two-year course in postgraduate psychology studies at York University. In April of 2000, when Kevin was still attending the Christian Academy, his teacher referred him to Ms. Gauthier because of issues of self-control and self-mutilation. Kevin has since been removed from the Christian Academy by the foster parents, and is presently being “home schooled” by foster parent Lorie Doe.
According to Ms. Gauthier, at the time of the referral, Kevin had been displaying aggression, getting up in the middle of the night, and destroying property. Ms. Gauthier testified that, since April of 2000, she has met with Kevin about 10 times for 3-4 hours per visit. She claimed that Kevin has shown improvement, in that he was very reserved and fearful at first, but now has “opened up,” his behavior has changed, and he is no longer destructive. Ms. Gauthier testified that while Kevin had previously shaved his head in an effort to hide from respondent S., he is now letting his hair grow. Ms. Gauthier also opined that Kevin has been excited about home schooling, talks about friends who come over, and in her opinion does not miss school socialization.
Ms. Gauthier habitually referred to Kevin as “Michael,” even after being requested by the court to refer to the child by his *824 given name. By way of explanation, she stated that Kevin has asked her to call him “Michael.” Ms. Gauthier testified that the Does had wanted “Christian counseling” for Kevin, but that she uses secular counseling as well as biblical counseling, and that there is no difference between her secular and Christian counseling where children are concerned.
Questioned by the court, Ms. Gauthier testified that Kevin has been informed that he is a foster child, and that this is very frightening to him. She also stated that Kevin has been diagnosed as having Attention Deficit Hyperactivity Disorder (ADHD), but she was not aware who had made this diagnosis or if he has ever been determined to need special education. There was no testimony offered as to whether Ms. Gauthier has considered medical assessment for pharmacological intervention as a possible treatment for Kevin’s ADHD.
The Law Guardian’s next witness, foster parent Lorie E. Doe, has been a certified foster parent for four years. Kevin has been placed with the Doe family for 22 months. The Does have adopted three children: Jeremiah, age 9, Cassandra, age 10, and Sarah, age 18. Ms. Doe testified that she has “home schooled” Kevin, Jeremiah, and Cassandra since September of 2000, because all three children have been diagnosed as having ADHD by a psychologist or doctor.
Ms. Doe stated that she sends the children’s report cards to the principal of the Clarence Central Elementary School, and that the children will take a standardized test at the end of the year. Ms. Doe, who has no teaching credentials, testified that she has “accelerated” Kevin to the third grade, and that “he’s doing wonderful [sic].”
Ms. Doe believes Kevin is receiving adequate socialization, in that he participates in Awana, a Christian version of the Boy Scouts; Oasis, a Christian drama and choir group; church activities; and a secular indoor soccer league. During the summer, Kevin will attend Christian Bible school. The Does live in the country, but Ms. Doe testified that there is another home schooled child who lives about a mile away whom Kevin enjoys playing with during the day, while other children attend school.
As had Ms. Gauthier, Ms. Doe consistently referred to Kevin as “Michael,” even after being requested by the court not to do so. In response to the court’s questions, Ms. Doe stated that Kevin was diagnosed as having ADHD by Dr. Hasheen (phonetic) last spring or summer, and that Cassie and Jeremiah were diagnosed with ADHD by the Condrell Center late winter of last year.
*825 The Law Guardian’s final witness was Cherri Carroll, an adoption and foster care worker with the Gateway-Longview agency, the agency which placed Kevin with these foster parents. Ms. Carroll, who has been Kevin’s caseworker since November of 1999, testified that Kevin’s behaviors are beginning to minimize, but she gave no specific reasons for that opinion. She opined that she is not concerned about Kevin’s placement with the Does. Following Ms. Carroll’s testimony, the Law Guardian and the other parties rested, and the court reserved decision.
Findings of Fact and Conclusions of Law
The court does not doubt that Ms. Doe is well intentioned, and has genuinely tried to provide for Kevin’s physical, emotional, and educational needs. However, there is ample evidence in the record which demonstrates that Kevin is not receiving the special education and professional psychological intervention he needs.
It is clear that neither counselor Gauthier nor foster care provider Doe have appropriately assisted Kevin in realistically dealing with his identity as Kevin M., a foster child. Rather, the evidence demonstrates that they have, at the very least, enabled Kevin to persist in the fantasy that he is “Michael Doe,” that Ms. Doe is his real mother, and that her children are his true siblings. Both the counselor and the foster care provider habitually refer to Kevin as “Michael.” Further, the foster parent must bear some responsibility for the bizarre and tragic lengths to which Kevin has gone to disguise himself from his mother. Little boys do not shave their own heads, unless they are being inadequately supervised. Seven-year-old children are not permitted to habitually wear glasses by appropriate caretakers, unless glasses have been prescribed for them. The court does not reach the issue, raised by Dr. O’Brien’s testimony during the January hearing, that Kevin has had adult assistance in evolving the story of parental abuse, and thereby in demonizing his natural mother. It is sufficient to find that Kevin has been abetted by the foster parent in formulating an unreal identity as the member of a permanent family, and that he has not received professional psychiatric or psychological therapy to address this potentially catastrophic syndrome.
The New York courts have on numerous occasions and in a variety of contexts admonished foster parents against conducting themselves in a manner inconsistent with their responsibil *826 ity to prepare the child for eventual return to the parental home. Thus, the United States Supreme Court, in Smith v Organization of Foster Families for Equality & Reform (431 US 816, 837, n 40 [1977]), took notice that “the New York courts have upheld removal from a foster home for the very reason that the foster parents had become too emotionally involved with the child.” (Citing Matter of Jewish Child Care Assn. [Sanders], 5 NY2d 222 [1959].) For example, in State ex rel. Wallace v Lhotan (51 AD2d 252, 255 [2d Dept 1976], lv denied 39 NY2d 705, appeal dismissed 39 NY2d 743), the appellate court observed that the foster parent had “a duty not to interpose herself between the children and their natural mother,” and that her alienating behavior warranted court intervention. The Lhotan Court explained:
“In any case, the foster parents must make a serious attempt to encourage, not discourage, the improvement of relations between the children under their charge and a mother who is trying to re-establish the bonds of family love and concern. A portion of the love that foster parents have for the children must be directed towards easing their return to their natural parent. Whatever circumstances will rend the family fabric, it should not be the result of actions of the foster parents, who have taken on their delicate responsibilities on the solemn promise to do otherwise.” (Id., at 259.)
Similarly, in Matter of Jewish Child Care Assn. (Sanders) (5 NY2d 222, 229 [1959], supra), the Court of Appeals, this State’s highest Court, held that the trial court had not abused its discretion in removing a child from the care of the foster parents, observing that “[i]ndeed, it is the extreme of love, affection and possessiveness manifested by the [foster parents], together with the conduct which their emotional involvement impelled, that supplies the foundation of reasonableness and correctness for his determination.” Again, in Matter of Spence-Chapin Adoption Serv. v Polk (29 NY2d 196, 205 [1971]), the Court of Appeals warned that “[t]he temporary parent substitute must keep his proper distance at all costs to himself.” (See also, People ex rel. Ninesling v Nassau County Dept. of Social Servs., 46 NY2d 382, 389 [1978].)
Even in an era of concurrent permanency planning, when the agency may simultaneously plan for the alternative outcomes of return of the child to the natural parent and adoption, the agency and the foster care provider cannot permit the *827 child to believe that the placement is a permanent home while the rights of the natural parent are extant. That is the line which has been crossed here, and the traumatic and potentially damaging consequences to Kevin if he must be removed from this foster care placement without adequate psychological preparation are obvious. Because the court finds that Kevin has not had appropriate expert intervention to equip him in comprehending and dealing with his actual identity and situation, the court will order that Kevin be provided with the therapeutic services of a licensed psychiatrist or psychologist selected by the Erie County Department of Social Services. The therapist should especially focus on the issue of Kevin being misidentified as “Michael Doe” and provide treatment toward reestablishing his identity as “Kevin M.,” if this is a psychologically appropriate and achievable goal. The psychological or psychiatric intervention should also involve, as the therapist deems appropriate, treatment regarding past abuse issues, Attention Deficit Hyperactivity Disorder, and other attachment and adjustment problems.
The removal of Kevin from school by the foster care provider must also be addressed. The testimony indicates that Kevin has been diagnosed as having ADHD, and that the foster parent removed him from the Christian Academy because he was a behavioral problem in the class. He is presently being “home-schooled.”
In New York State, a child’s interest in receiving an adequate education is a right of constitutional dimension. Article XI of the New York State Constitution mandates that “[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.” (NY Const, art XI, § 1.) The Legislature has established compulsory attendance laws consistent with this constitutional mandate. (See, Education Law §§ 3205, 3212, 3233.) So strong is the presumption that a child will attend a school that “[p]roof that a minor child is not attending a public or parochial school in the district where the parents reside makes out a prima facie case of educational neglect, pursuant to section 3212 (2) (d) of the Education Law.” (Matter of Christa H., 127 AD2d 997 [4th Dept 1987].)
While a claim “rooted in religious belief’ may be raised by a parent to argue against governmental enforcement of compulsory attendance laws (Wisconsin v Yoder, 406 US 205, 215 [1972]), at no time has the foster care provider claimed that Kevin’s “home schooling” is required because of religious *828 conviction. Even if a religion-based claim were raised, Ms. Doe is not- the child’s parent, and cannot assert the commanding liberty interest that a parent has in maintaining the care, custody and management of the child, so as to claim a right to exempt the child from regular school attendance on religious grounds. (Santosky v Kramer, 455 US 745, 753 [1982]; see also, Smith v Organization of Foster Families for Equality & Reform, supra, 431 US, at 846; see generally, Wisconsin v Yoder, supra.) Here, the County agency is the legal custodian of Kevin, and “a foster parent who is compensated for his services does not stand in an in loco parentis relationship with the child.” (Andrews v County of Otsego, 112 Misc 2d 37, 41 [Sup Ct, Otsego County 1982].)
In addition to the compulsory education laws applicable to all children, the Legislature has enacted a comprehensive statute to ensure that foster children are not deprived of the benefit of an education at public expense. (Education Law § 3202 [4] [a].) Regulations promulgated by the New York State Department of Social Services create an affirmative obligation on the part of the foster parent to enable the child to freely socialize with other children in the community and to benefit from regular school attendance. Title 18, section 443.3 (b) of the NYCRR requires that the agreement between the county as the child’s legal custodian and the certified foster care provider must include certain provisions relating to the care of the child. The foster parent must stipulate, inter alia, that he or she will (1) enable the foster child to “mingle freely and on equal footing with other children in the household and in the community,” and (2) “arrange for children of school age to attend school regularly as required by the Education Law.”
It follows that a foster child has the right to an education and the customary opportunities for socialization afforded by regular school attendance in the company of other children in the community. The evidence demonstrates that Kevin’s exposure to other children, with the singular exception of his involvement in soccer, is limited to participants in church-based activities. The isolation of Kevin’s home-based instruction, together with the restricted nature of his acquaintances outside the home, makes for an insularity which is contrary to the regulatory direction that a foster child be enabled to “mingle freely” with other children in the broader community. In view of this, the court finds that it is in Kevin’s best interest that he be promptly enrolled in and regularly attend a “public or parochial school.” (Matter of Christa H., 127 AD2d 997 [4th *829 Dept 1987].) While the court will not prohibit the Department, the Law Guardian, and the foster care provider from agreeing that Kevin be enrolled in the Christian Academy or other suitable parochial school, the county shall in no event be obligated to pay tuition or other expenses relative to such enrollment except as may otherwise be required by law.
Further, it is alleged that Kevin has been diagnosed with Attention Deficit Hyperactivity Disorder, and Ms. Doe testified that this condition was the reason she removed him from the Christian Academy. If he is a special needs child, Kevin is entitled to appropriate and professional educational intervention. Pursuant to Education Law § 4402 (2) (a), each school district is required “to furnish suitable educational opportunities for children with handicapping conditions” by provision of one of the special services or programs listed in Education Law § 4401 (2), as determined by the need of the individual child. The child’s need is determined by a committee or subcommittee on special education (hereinafter CSE), which is required, inter alia, to “identify, review and evaluate at least annually, the status of each child with a handicapping condition and each child thought to be handicapped who resides within the school district” (Education Law § 4402 [1] [b] [2]), and to make recommendations to the child’s legal custodian and the Board of Education as to appropriate educational programs and placement. (Education Law § 4402 [1] [b] [3].)
It is well settled that the Family Court “may solicit and order such care, education and treatment” of children with special needs who are in the custody of the county. (Usen v Sipprell, 41 AD2d 251, 259 [4th Dept 1973].) Kevin is entitled to the procedures and protections which the Legislature has guaranteed to “each child with a handicapping condition and each child thought to be handicapped who resides within the school district.” (Education Law § 4402 [1] [b] [2].) This court is empowered pursuant to Family Court Act § 255 to order the officers and employees of the school district in which Kevin resides to perform the duties imposed upon them pursuant to Education Law §§ 4402, 4004, and 4005, “to review, evaluate, recommend, and determine the appropriate social services or programs necessary to meet the needs of a handicapped child” Since it appears to the court “that [an] adequate administrative procedure to require the performance of such duties is not available,” the court will order that Kevin be promptly evaluated by a CSE of the Clarence Central School District. The court will also order the Erie County Department of Social Ser *830 vices “to render such information, assistance and cooperation” as is necessary to effectuate this purpose. The court will further direct that the recommendations made by the CSE relative to Kevin’s education be implemented, reserving the County’s right as the child’s custodian to object to such recommendations as provided by the Education Law. It should be borne in mind by the County and the Law Guardian that Education Law § 3204 (4-a) provides that “[e]very pupil, having been determined to be a ‘child with a handicapping condition’ by a committee on the handicapped, shall be offered an opportunity to receive the benefits of an appropriate public education as prescribed in article eighty-nine of this chapter.”
Finally, the ultimate responsibility of the agency for Kevin’s protracted and unacceptable situation cannot be overlooked. Here, after an adjudication of the serious abuse of Kevin’s infant sister and his own derivative maltreatment, the agency failed to make diligent and appropriate efforts to rehabilitate the respondent parent, or to make application to be relieved of the obligation to undertake such efforts. (See, decision and order, entered May 5, 2000.) At the same time, the agency caseworker erroneously and improperly advised the foster care provider that there was “zero chance” that Kevin would be returned to his parent. The agency’s mishandling of this case not only resulted in the court being constrained by law to dismiss the Department’s petition to terminate the parental rights of the respondent, thereby seriously delaying Kevin’s prospect for permanency, but also facilitated the Does’ treatment and management of Kevin as their own child. Moreover, the agency improperly delegated to the foster care provider the decisions concerning Kevin’s right to receive an adequate education and his entitlement to professional therapeutic intervention, permitting Kevin to be removed from regular school attendance and to be counseled solely by an uncertified worker. Also disturbing is the testimony of the current Gateway-Longview caseworker that Kevin’s present placement does not cause her any concern.
A further hearing to review the implementation of this plan will be held within 30 days of entry of this decision and order. Should the foster care provider fail or refuse to cooperate with the Department in making Kevin available for psychological or psychiatric therapy, enrolling him in school and ensuring his regular attendance, or cooperating with the CSE and its requests, such failure or refusal will be regarded by this court as compelling evidence of her unfitness to continue as Kevin’s foster care provider.
*831 Wherefore, it is ordered, decreed, and adjudged that Kevin M. be provided with the therapeutic services of a licensed psychologist or psychiatrist selected by the Erie County Department of Social Services to address the issues set forth herein, and such other issues as may appear to the psychologist or psychiatrist as necessary to assist Kevin; the Erie County Department of Social Services shall forward to such therapist a copy of this decision and order, and any prior decisions, orders, and agency records as may be of assistance; such therapeutic services shall be initiated prior to March 30, 2001; and it is further ordered, decreed, and adjudged that Kevin M. be enrolled in and commence regular attendance in a public or parochial school no later than March 23, 2001; should the Department, the Law Guardian, and the foster care provider agree that the child may attend a suitable parochial school, in no event shall the County be obligated to pay tuition or other expenses relative to such enrollment, except as may otherwise be required by law; and it is further ordered, decreed, and adjudged pursuant to Family Court Act § 255 that a Committee or Subcommittee on Special Education identify, review and evaluate Kevin M. as soon as practicable, and make recommendations to Kevin’s legal custodian, the Erie County Department of Social Services, and the Board of Education as to appropriate educational programs and placement; the Erie County Department of Social Services shall render such information, assistance, and cooperation as is necessary to effectuate this directive; and it is further ordered, decreed, and adjudged that the recommendations made by the Committee or Subcommittee on Special Education relative to the education of Kevin M. be implemented, subject to the County’s right as the child’s custodian to object to such recommendations as provided by the Education Law.

. Names used herein are fictitious for purposes of publication.

. The extensive background of this matter is set forth in the court’s decision under docket No. B-13408-09-1999, entered on May 5, 2000, which dismissed the Department’s petition for a finding of permanent neglect; and the decision and order under docket No. N-28446-2000, entered on January 25, 2001, which granted the motion of the Department and the Law Guardian to suspend parental visitation as contrary to the children’s best interests. Familiarity with the prior decisions and orders is presumed.